743 F.2d 800
 Medicare&Medicaid Gu 34,160, 17 Fed. R. Evid. Serv. 669
UNITED STATES of America, Plaintiff-Appellee,
v.
Dr. Donald L. GOLD, Opti-Center, Inc., Patricia M. Warren,
and Gary N. Highsmith, Defendants-Appellants.
 No. 83-3230.
 United States Court of Appeals,
Eleventh Circuit.
 Oct. 3, 1984.
 
 J. Michael Hayes, Tampa, Fla., for Gold and Opti-Center.
 Charles R. Wilson, Tampa, Fla., for Warren.
 Mark A. Pizzo, Asst. Federal Public Defender, Tampa, Fla., for Highsmith.
 Joseph D. Magri, Asst. U.S. Atty., Tampa, Fla., for plaintiff-appellee.
 Appeals from the United States District Court for the Middle District of Florida.
 Before RONEY and VANCE, Circuit Judges, and SIMPSON, Senior Circuit Judge.
 VANCE, Circuit Judge:
 
 
 1
 The appellants in this case, Dr. Donald Gold, Patricia Warren, Gary Highsmith, and Opti-Center, Inc., were convicted in the United States District Court for the Middle District of Florida on charges of conspiracy and defrauding the government through the filing of false Medicare claims in violation of 18 U.S.C. Secs. 371, 287, and 1001.[1] The appellants challenge their convictions on a variety of grounds, but we find no merit to any of their contentions and therefore affirm the judgment of the district court.
 
 I. STATEMENT OF FACTS
 A. The Medicare--Part B Program
 
 2
 The Medicare--Part B program was established by Congress in 1965 to provide supplementary medical insurance benefits for Social Security recipients. Under this program, beneficiaries who pay a $60 annual deductible are entitled to reimbursement for eighty percent of the reasonable cost of covered medical services and supplies. Routine eyewear is specifically excluded from Medicare coverage, but new and replacement prosthetic devices are covered if a physician certifies that the item is a medical necessity. Post-operative cataract eyewear is covered by Medicare, although cataract sunglasses are not.
 
 
 3
 Medicare is administered by the Health Care Financing Agency (HCFA), but HCFA does not handle claims submissions and reimbursements directly. In Florida, HCFA has a contract with Blue Cross/Blue Shield of Florida, Inc. (Blue Cross), whereby Blue Cross serves as a fiscal intermediary to receive, adjudicate and pay Medicare--Part B claims submitted to it by Medicare beneficiaries and health care providers. Blue Cross processes these claims in accordance with the instructions supplied by HCFA through its Carrier's Manual, which explains the mechanics of the Medicare--Part B program and delineates which types of expenses are and are not covered.[2]
 
 
 4
 Claims for reimbursement from Medicare can be made in two ways. When the claim is unassigned, the Medicare beneficiary submits the request for reimbursement himself. The beneficiary also has the option of assigning the claim to the provider of the item or service, who then submits the claim on behalf of the beneficiary and receives reimbursement directly from Blue Cross. In either case, the same claim form is used: standard form 1490. Form 1490 contains such information as the Medicare beneficiary's name, address, type of illness or injury, date of service, type of service, and the cost of the item or service provided. After the claim is submitted to Blue Cross, it determines whether to make or refuse payment. If an approved claim has been assigned to the health care provider, the reimbursement check is sent directly to the provider.
 
 B. The Activities of the Defendants
 
 5
 Opti-Center, Inc. was a Georgia corporation engaged in selling retail eyewear that began doing business in Florida's Tampa Bay area in 1976. Opti-Center had a lease arrangement with Montgomery Ward and operated as the "Montgomery Ward Optical Department" in eight of its stores in and around Tampa. Except for a brief interval in 1980, Columbus optometrist Dr. Donald Gold was the President and majority shareholder of Opti-Center from its inception until its sale to the U.S. Vision Company in 1981. Patricia Warren was Regional Manager for the eight Tampa Bay area stores, with responsibilities that included hiring and firing of personnel, training, coordination, scheduling, and monitoring of inventory. Sue Conway was an optician who started out as the manager of the Opti-Center unit at the East Lake Square Mall in 1978; she was later promoted to the position of district manager in charge of the Dale Mabry unit and two other stores. Gary Highsmith was another optician who joined Opti-Center in April 1980 and became the manager of Opti-Center's Lakeland store.
 
 
 6
 The evidence presented at the trial established that Dr. Gold was a hard-driving businessman who carefully supervised almost every detail of Opti-Center's operations. When optician Howard Gilbert applied for a position with Opti-Center in the fall of 1977, for example, Dr. Gold was present at his interview and instructed him in the use of a sales tract that was employed in all of Opti-Center's stores. Dr. Gold told Gilbert that he should memorize the tract--which was essentially a structured sales presentation designed to overcome any objections a potential customer might have to purchasing eyewear--before reporting to work. Gilbert also testified that Dr. Gold told him that he would expect Gilbert's store to produce at least $600 a day in sales.
 
 
 7
 Dr. Gold followed through on these initial instructions by making occasional inspection tours of his individual stores. Gilbert recalled that Dr. Gold would usually stop by four or five times a year. He was often accompanied by Patricia Warren, who in her capacity as regional manager made frequent inspection visits. On these occasions, Gilbert reported, they would quiz the opticians and other salespersons on the use of the sales tract and observe their handling of potential customers. If an employee's knowledge of the sales tract appeared defective, he would be sent home with orders not to return until he had committed it to memory. Dr. Gold and Warren also instructed their salespersons not to wait for potential customers to enter the optical department, but to aggressively seek them out by approaching shoppers as they were passing through the store aisles nearby. Gilbert estimated that "nine out of ten people we sold glasses to were people that were not thinking about buying glasses when they walked into Montgomery Wards'." Dr. Gold's obsessive concern for the bottom line was also reflected by his practice of calling the stores at the end of each day to inquire about the sales figures. Gilbert testified that Warren usually called each of the stores three or four times a day as well, and the store manager would be harshly reprimanded and told to do better if sales were down.
 
 
 8
 The pressure that Dr. Gold put upon Opti-Center employees to generate ever-increasing sales figures gradually led the company and its personnel into illegal activity. Opti-Center's slide into criminality began in the summer of 1979. Gilbert had been transferred to the Opti-Center unit at Clearwater, where he found that it was often difficult to make sales because the senior citizens who made up most of the store's clientele were usually unable to pay the full purchase price in cash. Gilbert discussed this problem with Warren and suggested that it would be easier to make sales if the company changed its policy against accepting claims on assignment. Dr. Gold approved the change, and the sales figures of the Clearwater store improved dramatically.
 
 
 9
 One of the principal growth areas at the Clearwater unit was cataract glasses. At some point in the autumn of 1979, Gilbert sold a pair of cataract sunglasses on assignment to a customer who had purchased a pair of regular cataract glasses from him shortly before. When Blue Cross subsequently paid on the assignment, Gilbert realized that he could boost his sales figures by urging customers who came into the store to purchase regular cataract glasses to acquire a pair of cataract sunglasses at the same time. There was a slight hitch, however: Blue Cross proved unwilling to pay for more than one pair of glasses when two pairs were submitted on the same claim form. Warren and Gilbert conferred about this problem, concluded that the computer at Blue Cross was misreading the claim form, and decided to start submitting two separate forms with different dates for the two pairs of glasses. This practice of falsifying one of the dates seemed to take care of the problem, and Opti-Center had no further difficulties collecting from Blue Cross on each pair of glasses.[3]
 
 
 10
 Because these simultaneous sales of both regular and dark-tinted cataract glasses--known as "double-cataract" sales by company employees--could bring in as much as $450 from a single sale, they soon became a major focus of Gilbert's business. He redesigned the sales tract to accomodate the special concerns of cataract customers, and business at the Clearwater store boomed. Dr. Gold and Warren were delighted, and they began urging Opti-Center employees at other stores to emulate Gilbert's techniques. Gilbert testified that Dr. Gold was fully aware of what was involved in the new sales procedure, since he often examined the sales files on his inspection visits and frequently inquired about the high levels of accounts receivable that were generated by accepting so many double cataract sales on assignment. At no time did Dr. Gold raise any objection to this procedure, despite the fact that he had signed a pleading in 1975 acknowledging that he had received and read a communication from the State of Georgia explaining that its state health insurance program was identical to Medicare and including as an attachment section 2130 of the Carrier's Manual, which explicitly stated that payment could not be made for cataract sunglasses. In addition, at least one Opti-Center employee with prior experience elsewhere had told Gilbert and Warren in early 1980 that they were wrong about Medicare paying for cataract sunglasses.
 
 
 11
 Nevertheless, Gilbert continued making double cataract sales and soon ventured into other fraudulent practices as well. In addition to spacing out the sales dates on the 1490 forms, Gilbert began changing the prices on glasses that cost the same amount in order to make them appear different from one another. Then he began billing Medicare for more expensive lenses than he had actually provided a customer--such as charging Medicare for bifocal lenses when he had in fact supplied the customer with less expensive single-vision lenses. On some occasions when he had merely changed the lenses within a customer's existing frames, Gilbert billed Medicare for both the lenses and a pair of frames. He also charged Medicare for the cost of mistakes and re-doing lenses that proved unsatisfactory to customers. Gilbert's initiative and productivity were duly rewarded by Opti-Center with several raises before he left the company in the autumn of 1980.
 
 
 12
 The techniques that Gilbert had pioneered gradually infected the other Opti-Center stores in the Tampa area as Dr. Gold and Warren put pressure on other employees to emulate Gilbert's success. When Sue Conway became a district manager in the spring of 1980, Warren urged her to boost sales at her two units by instructing her personnel to make double cataract sales. Gary Highsmith likewise began stressing double cataract sales when he was hired as the store manager of the Lakeland unit in April 1980. When Sue Conway and Warren visited the Lakeland store a month later, Conway examined Highsmith's Medicare files (which were located in a drawer labeled "cataract city") and noticed that he always used the same two procedure codes, the same description, and the same price on the 1490 forms, regardless of what type of glasses he had actually sold. This practice apparently sped processing of the assigned claims, helping to reduce the total of accounts receivable. In addition, the lens descriptions and procedure codes used by Highsmith permitted him to claim the maximum amount ($250) that Medicare refunded on eyewear.
 
 
 13
 Conway explained Highsmith's practices to Warren and, with her approval, implemented similar procedures at her own stores. When Conway's units experienced a significant increase in sales, Warren bragged about their success to other Opti-Center employees and urged them to adopt Conway's procedures as well. Dr. Gold was apparently delighted with the new sales techniques, telling Conway in the summer of 1980 that he wanted Medicare sales to comprise 50% of their business.
 
 
 14
 By the summer of 1980, double cataract sales had become an important source of business at almost all of the Opti-Center stores. Although some of Opti-Center's employees may have heretofore been genuinely ignorant about the extent of Medicare's coverage, such claims became less plausible after Blue Cross sent out a letter in June 1980 to all eyewear providers in Florida advising them that Medicare did not cover cataract sunglasses or routine eyewear for which there was no medical necessity. Nevertheless, the fraudulent practices continued. When Opti-Center opened a new store called Tampa Bay Center in the autumn of 1980, fifty percent of its business involved Medicare claims, and over ninety percent of those were double cataract sales. The flood of 1490 forms became so great that a substantial backlog accumulated. Conway sought assistance from Dr. Gold, urging him to hire additional personnel to handle the Medicare paperwork, but he refused. Dr. Gold also complained to Warren that Conway should spend less time filling out forms and more time out on the sales floor.
 
 
 15
 The rapid growth of Medicare-based business at the Tampa area stores required Opti-Center to hire a number of new opticians, some of whom objected to the company's Medicare billing practices. When Nancy Shepard was hired as an optician in November 1980, she told Warren that Medicare beneficiaries were entitled to only one pair of eyewear per year, and then only if the request was accompanied by a doctor's prescription. Warren challenged her understanding of the Medicare program, and Shepard replied that this had been the law when she worked for an opthamologist two days before. Warren replied that the law had been changed. Another employee, Debbie Develle, also objected to Opti-Center's practice of telling customers that they were entitled to new glasses every year, even without a doctor's prescription. When Develle's supervisor told her that her perception of the law was incorrect, Develle called a toll-free number at Blue Cross in Jacksonville and confirmed that her prior understanding was in fact accurate. When Sue Conway brushed aside this information, Develle promptly resigned. Conway did pass along Develle's claims to Warren, but the latter took no action. At about the same time Linda Robinson, the manager of the Tampa Bay Center store, likewise became concerned about rumors that billing Medicare for the double-cataract sales was illegal and she also called Blue Cross to confirm her suspicions. Robinson informed Warren of what she had learned, but the company's only response was to demote Robinson to the position of a "floater", who shifted between different stores as the volume of business required. Robinson subsequently left the company.
 
 
 16
 Thus, by the autumn of 1980, it was becoming increasingly difficult for company officials to close their eyes to the illegality of Opti-Center's billing practices. Sue Conway admitted at trial that she had realized as early as August of 1980 that some of the claims were improper. As a result of some information she had come across earlier that summer, Conway had instructed her subordinates that Medicare would pay for routine eyewear. Blue Cross subsequently rejected one of the claims on the grounds that no illness or injury was involved. Since it was company policy not to dispense glasses until full payment was received, this created a problem with regard to customers whose glasses were ready but who might not be able to pay the full amount if their claims were disallowed by Medicare. Conway falsely amended the claims to indicate that the customers were aphakic and resubmitted the claims to Medicare. Conway instructed her employees not to bill Medicare for such sales in the future, and in November of 1980 she confessed to Warren that she "had done some illegal things with Medicare billings." Warren responded that she did not want to hear about it. In early 1981, however, Conway learned that some of her employees had continued to charge Medicare for routine eyewear. She took this problem to Warren, and they decided--after clearing it with Dr. Gold--to issue some refunds. The refunds appear to have been made primarily in cases where the claims falsely stated that the patient had had cataract surgery or where the glasses were never even ordered for the customer. Conway indicated that no effort was made to match the reasons offered on the refund voucher sent to Blue Cross with the actual inaccuracies on the original claim.
 
 
 17
 Sue Conway initially handled the refund process, but in April 1981 her sister Mary was hired by Warren to take responsibility for the company's medical insurance paperwork. Warren instructed Mary Conway to refund any orders where the customer had not had cataract surgery, where Medicare had paid two or three times on a single order of glasses, or where Medicare had been charged for glasses that were never made or provided to the customer.[4] Warren told her not to refund amounts paid for cataract sunglasses, lens reworkings, or glasses not based on a prescription, however, Warren also indicated that it was not necessary to provide an accurate explanation on the refund voucher that was sent to Medicare. Instead, Conway was to arbitrarily select one of three different generalizations: overpayment, submitted improperly, and wrong procedure code.
 
 
 18
 Mary Conway then started to work through the files at each of the Opti-Center stores in the Tampa area. She noticed double cataract sales at all of the units, as well as overpayments and billings for routine eyewear. The fraudulent practices were particularly widespread at the Lakeland store, where Gary Highsmith was in charge. Although double cataract sales were supposed to have ceased at all stores in April 1981, Highsmith was still making them when Mary Conway began her examination of the files at the Lakeland store in June of that year. She also noted that there were many cases in the files at the Lakeland store where Medicare had been billed for glasses that were never made, and where the Opti-Center work order was blank because Highsmith had never bothered to obtain a prescription. Conway issued over $6,000 in refunds from the Lakeland store for that reason alone. Highsmith did not appear particularly surprised or dismayed at the widespread evidence of fraud in his files; Mary Conway testified that he sometimes greeted her holding up his fingers like prison bars in front of his face and joking, "We are all going to go to Alcatraz."
 
 
 19
 In February 1981, Dr. Gold began negotiations with William Schwartz, President of the U.S. Vision Company, who was interested in purchasing Opti-Center.[5] The negotiations initially faltered because Dr. Gold balked at Schwartz' request for the company's books and records. According to Schwartz' testimony at trial, Dr. Gold asserted that this financial information was merely "academic", explaining that his company operated very differently from U.S. Vision and that direct comparisons could therefore be misleading. Dr. Gold indicated that he was essentially selling a method of doing business--that rather than relying on advertising or supplying eye examinations as part of its service, "he had devised a method to sell eyeglasses off the aisle of the store," whereby his employees "hovered on the aisle of the store and convinced the customer to come into the department to get their eyeglasses cleaned" rather than "waiting for the customer to come in and ask for a pair of glasses or order a pair." Dr. Gold emphasized to Schwartz that his approach required "constant checking on it, frequent calls. He said it took a hands-on type of management to--because you had to worry every hour as to how many people were brought into the department .... [I]t took his constant calls and the use of Mrs. Warren in the store to make sure that the employees did this on an hourly and daily basis."
 
 
 20
 Dr. Gold urged Schwartz to continue Opti-Center's focus on cataract sales, noting that this "was especially valuable because instead of a fifty dollar pair of glasses, you might have a two hundred fifty dollar or three hundred fifty dollar pair of glasses generated on the basis of cleaning somebody's glasses." Dr. Gold also attributed Opti-Center's success to its policy of accepting sales on assignment. When Schwartz expressed some concern about the problem of getting customers to pay the deductible or the remaining twenty percent balance, Dr. Gold replied that the trick was to price the glasses high enough so that it became immaterial whether the company ultimately managed to collect on the balance or the deductible.
 
 
 21
 Schwartz and Dr. Gold eventually managed to reach an agreement and the sale of the company was finalized on July 23, 1981. Approximately one week before the date of the sale, Warren told Sue Conway that Dr. Gold had called and requested that they remove all of the Medicare records from the eight Tampa area stores, taking care to do so after hours so that no one would know what they were doing. Warren and the two Conway sisters accordingly met at the East Lake store after it closed on Saturday evening. While they were there, Warren received a telephone call from Dr. Gold, and Sue Conway overheard them discussing when they would be removing the records from the various stores. Over the course of the next three or four days, Warren and the Conway sisters collected the records of all sales that had been billed to Medicare and re-filed them in the trunks of Warren's and Mary Conway's cars. About a week after the company was sold, Sue Conway visited Warren at home and asked what they should do with the captive Medicare records. Warren called Dr. Gold to find out. When Warren explained why she was calling, Dr. Gold first asked her if anyone else was present. Warren lied and told him, "No, Susie is not here," whereupon Dr. Gold apparently told Warren to dispose of the records. Conway heard Warren reply, "Don, we can't just ditch the records," but he insisted, and further instructed Warren that "he is not to be connected with it in any way, he was not involved, and to not say that he had anything to do with it and just have the records disappear." Warren and Conway decided that this was just too risky, and the records eventually found their way back to the respective stores.[6]
 
 
 22
 After the sale to U.S. Vision was finalized, Schwartz had his first opportunity to examine the sales records in the Opti-Center stores in the Tampa Bay area.[7] He was astonished to discover that anywhere from twenty-five percent to forty percent of the sales orders were for cataract patients, a far higher volume than at U.S. Vision's other stores. Schwartz noticed that many of the cataract sales to Medicare patients involved two pairs of glasses; that in many cases Medicare had been billed for sales of cataract sunglasses or routine eyewear; and that there were instances where glasses were charged to Medicare even though no prescription was obtained. He also found cases where Medicare had been billed for glasses that were never made or delivered to the customer. Schwartz brought up these apparent irregularities with Dr. Gold, who suggested that some of the forms probably reflected clerical mistakes, while in other cases he defended Opti-Center's handling of the claims. Schwartz was unpersuaded, and he substantially revised the company's processing of Medicare claims after the sale to conform to his understanding of the law.[8] Although U.S. Vision continued to utilize Dr. Gold's sales tract in the months immediately following the sale, the new procedures had a dramatic impact on Medicare-related business at the former Opti-Center stores. "It disappeared," Schwartz subsequently testified. "There was [sic] virtually no more Medicare sales." During the eighteen months preceding the sale of the company, in contrast, Medicare billings had totaled $346,000.
 
 
 23
 In the autumn of 1981, the Department of Health and Human Services commenced an investigation into Opti-Center's Medicare billing practices under the direction of Special Agent Frank Cioffi. This investigation ultimately resulted in the indictment and conviction of Dr. Gold, Warren, Highsmith, Opti-Center, Inc., and Sue Conway. All except the latter appeal.
 
 II. THE ISSUES ON APPEAL
 A. Adequacy of the Indictment
 
 24
 Patricia Warren initially attacks the sufficiency of the indictment with regard to the conspiracy count. Her objections appear to be two-fold: first, that the indictment did not adequately inform her of the nature of the charge against her; and second, that there was a material variance between the overt acts stated in the indictment and the proof actually adduced by the government at trial. We conclude that her claims are without merit.
 
 
 25
 Rule 7(c)(1) of the Federal Rules of Criminal Procedure provides that an indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." In general, an indictment need contain only those facts and elements of the alleged offense necessary to sufficiently inform the accused of the charge and to safeguard the accused from double jeopardy. Hamling v. United States, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974). When analyzing challenges to the sufficiency of an indictment, courts give the indictment a common sense construction, and its validity is to be determined "by practical, not technical, considerations." United States v. Morano, 697 F.2d 923, 927 (11th Cir.1983); United States v. Varkonyi, 645 F.2d 453, 456 (5th Cir. Unit A 1981). The indictment in this case was clearly sufficient to meet this standard. Paragraph 9 of the conspiracy count charged the defendants with knowingly presenting false claims to Medicare; it adequately set forth the elements of the alleged offenses and the nature of the defendants' criminal scheme,[9] which was further defined in paragraphs 10-19 of that count and in the overt acts listed under paragraph 20.
 
 
 26
 Warren also complains that the government sought to prove her involvement in the conspiracy by relying upon proof of events at trial that were not listed in the overt acts section of the indictment. Properly understood, however, a variance exists where the evidence at trial proves facts different from those alleged in the indictment, as opposed to facts which, although not specifically mentioned in the indictment, are entirely consistent with its allegations. See, e.g., Berger v. United States, 295 U.S. 78, 81, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935) (fatal variance exists where indictment charges single conspiracy and evidence demonstrates two different and disconnected smaller conspiracies); United States v. Guthartz, 573 F.2d 225, 228 (5th Cir.), cert. denied, 439 U.S. 864, 99 S.Ct. 187, 58 L.Ed.2d 173 (1978) (fatal variance exists where "an indictment enumerates the particular facts alleged to constitute the element of a charged crime and the proof makes out the elements in a different manner"); Project, Thirteenth Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1982-83, 72 Geo.L.J. 249, 390-91 (1983).
 
 
 27
 There is no constructive amendment here. Warren's claim is highly similar to that raised by the appellant in United States v. Malatesta, 583 F.2d 748 (5th Cir.1978), rehearing en banc, 590 F.2d 1379, 1381 (5th Cir.) cert. denied, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979). In Malatesta, the court noted that "when the indictment charges a violation of a statute in general terms, proof of acts of the kind described, although those acts are not specifically mentioned in the indictment, does not constructively amend it, at least absent a demonstration that this was, or might have been, prejudicial to the defendant." Id. at 756. Because Warren was not convicted of an offense other than that alleged in the indictment, United States v. Gonzalez, 661 F.2d 488, 492 (5th Cir. Unit B 1981), nor inadequately apprised of the nature of the charges against her, Berger, 295 U.S. at 82, 55 S.Ct. at 630, she has not demonstrated any prejudice to her "substantial rights" as required by Fed.R.Crim.P. 52(a) and her challenge must be rejected.
 
 B. Coconspirator Hearsay
 
 28
 Dr. Gold contends that the district court improperly admitted hearsay evidence against him in violation of the requirements established by the former fifth circuit in United States v. James, 590 F.2d 575 (5th Cir.) (en banc), cert. denied, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). He maintains that the government failed to prove he was a member of the alleged conspiracy as required by James, and therefore asserts that he was unfairly prejudiced by the admission of extensive testimony concerning acts and statements by Sue Conway, Gilbert, Warren, Highsmith, and other Opti-Center employees. We find no merit in this claim.
 
 
 29
 The former fifth circuit's decision in James established a two-step procedure for regulating the admission of testimony under the coconspirator exception to the hearsay rule. First, the trial judge is required to make a threshold determination on admissibility, either at a pre-trial hearing or during the presentation of the government's case in chief but before the evidence is presented to the jury. At this stage, the court is merely required to find that there is at least enough substantial, independent evidence of a conspiracy to take the issue to the jury, and that there is similarly substantial, independent evidence linking the defendant against whom the evidence is offered to the conspiracy. 590 F.2d at 580-82; United States v. Grassi, 616 F.2d 1295, 1300 (5th Cir.), cert. denied, 449 U.S. 956, 101 S.Ct. 363, 66 L.Ed.2d 220 (1980). If the coconspirator's extrajudicial statement is admitted into evidence under this procedure, James supplies a further safeguard by requiring the trial judge to reconsider its admissibility before submitting the case to the jury. At this point, the court on motion must determine as a factual matter whether the prosecution "has shown by a preponderance of the evidence independent of the statement itself (1) that a conspiracy existed, (2) that the coconspirator and the defendant against whom the coconspirator's statement is offered were members of the conspiracy, and (3) that the statement was made during the course and in furtherance of the conspiracy." James, 590 F.2d at 582; see also Fed.R.Evid. 801(d)(2)(E). If the government has failed to meet its burden under this test, the trial court must then decide whether the prejudice arising from the erroneous admission of the coconspirator's statement can be cured by striking the evidence and giving a cautionary instruction to the jury or whether a mistrial is necessary. James, 590 F.2d at 582-83.
 
 
 30
 Dr. Gold argues that his conviction must be reversed because the government failed to carry its burden of linking him to the conspiracy by a preponderance of the evidence. On the contrary, there was certainly ample evidence to support the trial judge's conclusion that the requirements of James had been satisfied. The evidence established that fraudulent practices were widespread at Opti-Center's stores in and around Tampa, suggesting that these improper claims were not the work of isolated corrupt employees, but of a broader conspiracy. Dr. Gold closely monitored the operations of all of the Opti-Center stores in the Tampa Bay area, calling them almost daily for sales figures and making regular inspection visits to the individual units. He examined the sales records at the units and observed his employees making double cataract sales. Although Dr. Gold had signed a pleading in 1975 indicating that he had read a statement explaining Medicare's coverage policies with regard to eyewear, he at no time objected to the improper practices he observed. He also displayed a curious degree of sensitivity concerning the Medicare sales records at his company's Tampa Bay stores. During his negotiations with William Schwartz of U.S. Vision concerning the sale of the company, he initially refused to allow Schwartz to inspect Opti-Center's records, even though Schwartz indicated that the price he could offer would have to be substantially reduced otherwise. In addition, Warren testified that Dr. Gold called her the week before the sale of the company to U.S. Vision was to be finalized and instructed her to remove all of the Medicare sales records from the stores.
 
 
 31
 There was also other evidence suggesting that Dr. Gold lied to Schwartz about some of his company's sales practices. For example, Howard Gilbert testified that Dr. Gold was aware of the company's practice of spacing out the dates on Medicare claims when one customer bought two pairs of glasses at the same time. Although Dr. Gold contended at trial and on appeal that this was done innocently, in order to avoid confusing the computer at Blue Cross/Blue Shield, when Schwartz questioned him about this practice, he responded that these were "accidents", resulting from lab delay, mistakes, or a mix-up in recordkeeping. Similarly, Dr. Gold suggested to Schwartz that the decline in the company's sales figures in the spring of 1981 was the product of the recession, when he in fact had reason to know that the decline stemmed from the company's abandonment of certain improper sales practices and the refunds he had authorized Sue Conway to make.
 
 
 32
 Thus, even without relying on such coconspirator testimony as Sue Conway's claim that she heard Dr. Gold instruct Warren to "ditch" the company's Medicare sales records prior to the sale to U.S. Vision, there was strong independent evidence that a conspiracy to defraud Medicare existed, that Dr. Gold was aware of this conspiracy, and that he went to great lengths to conceal its activities. We therefore cannot conclude that the trial judge erred in finding that the coconspirator testimony met the requirements for admissibility set forth in James.
 
 C. Admissibility of Documentary Evidence
 
 33
 Dr. Gold and Opti-Center also challenge the trial court's decision to permit the government to introduce into evidence various sections of the Carrier's Manual which HCFA supplies to its fiscal intermediaries for use in processing Medicare claims. The appellants contend that these exhibits were wholly irrelevant and immaterial because the Carrier's Manual was neither a law nor a regulation and there was no direct evidence that Dr. Gold or any other representative of Opti-Center had ever seen the provisions in question. The appellants also object to the admission into evidence of government exhibit 47. This exhibit consisted of a large chart which summarized the fraudulent practices the defendants were alleged to have committed and compared the claims they filed against the amount that, according to the testimony of various government witnesses was properly payable by Medicare in such cases. Appellants charge that the admission of this exhibit was improper because it "permit[ted] the government, in essence, to provide the jury with a typewritten outline of its final argument."
 
 
 34
 Because the decision to admit or to exclude evidence is a matter for the sound discretion of the trial judge, United States v. Ashley, 555 F.2d 462, 465 (5th Cir.1977), cert. denied, 434 U.S. 869, 98 S.Ct. 210, 54 L.Ed.2d 147 (1980), a ruling by the trial court in favor of admitting relevant evidence cannot be disturbed on appeal unless it is determined that there has either been an abuse of discretion or that the lower court's decision was clearly erroneous. United States v. Duff, 707 F.2d 1315, 1319 (11th Cir.1983). Because neither of these circumstances is present here, we conclude that the trial court's decision to admit these exhibits was entirely proper.
 
 
 35
 Under Fed.R.Evid. 401 and 402, the basic test governing admissibility is that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." By this standard, there can be little question that the provisions of the Carrier's Manual were admissible. The government carefully laid the predicate for the admission of this evidence during its direct examination of HCFA official Curtis Lord. Lord first described the statutory provisions governing the Medicare--Part B program, and then discussed the applicable regulations governing reimbursement under Medicare for prosthetic devices: 42 C.F.R. Secs. 405.231 (included items and services), 405.310 (non-included items and services), and 405.1634 (requirement of certification of medical necessity). Lord then explained that the Carrier's Manual was "HCFA's official explanation of the regulations and the statute. It's a manual that is a narrative that gives carriers the specificity they need to process claims on a day-to-day basis." Lord also added that HCFA's fiscal intermediaries were required to follow the statute, regulations, and the Carrier's Manual under their contracts with the Department of Health and Human Services, and he indicated that there had been no substantial changes in the provisions of the Carrier's Manual relating to eyewear in recent years. The government then proceeded to introduce sections 2130 and 2100.4 of the Carrier's Manual into evidence.
 
 
 36
 It should be apparent from this summary that although the government was careful to distinguish the Carrier's Manual from the statutes and regulations that its provisions explicated, it is equally clear that the Carrier's Manual directly reflected the interpretation of those statutes and regulations by the government officials who were charged with administering the programs involved. The provisions of the Carrier's Manual were therefore highly relevant to the issue of what types of claims were properly payable under Medicare, which was certainly one of the key issues in this case. The question whether Dr. Gold or anyone else at Opti-Center was familiar with these provisions relates to an entirely separate issue: whether they had the specific intent necessary to commit the crimes in question. In any event, the government did establish that sections of the Carrier's Manual or letters that paraphrased its language were in fact sent by carriers to opticians and optical stores. Dr. Gold apparently received such information on at least one or two occasions in the early and mid 1970's, for example, and a letter explaining the provisions of section 2130 of the Carrier's Manual--which dealt with coverage for prosthetic devices--was sent to all of Opti-Center's stores in June 1980. Accordingly, we have no difficulty in concluding that the value of the evidence outweighed the claimed prejudice, and the introduction of these exhibits was proper.
 
 
 37
 The issue of the admissibility of the chart comprising government exhibit 47 can also be disposed of easily. Fed.R.Evid. 1006 provides that "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation." Government exhibit 47 consisted of a forty-page chart containing fifteen columns of information. The first thirteen columns contained information derived either from other exhibits received into evidence or from oral testimony. The information in the last two columns reflected HHS Special Agent Frank Cioffi's conclusions as to what Medicare should actually pay in each instance. Agent Cioffi was properly qualified as an expert witness on Medicare coverage, and the trial court was careful to instruct the jury that the chart "does not constitute any findings by the court and ... it is the government's contention as to what the basic evidence shows." Because the evidence summarized by the chart was all before the jury in the form of documentary evidence or witnesses' testimony and the district judge carefully explained the nature of exhibit 47 to the jury, we cannot conclude that the district court abused its discretion by admitting the chart into evidence. United States v. Evans, 572 F.2d 455, 491-92 (5th Cir.), cert. denied, 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978).
 
 D. Admission of Testimonial Evidence
 1. Testimony Relating to Medicare Coverage
 
 38
 Appellants Dr. Gold and Opti-Center challenge a number of decisions by the trial court relating to the admissibility of testimonial evidence about Medicare billing practices. Specifically, they contend that the district court abused its discretion by permitting HCFA official Lord and HHS Special Agent Cioffi to testify concerning the scope of Medicare's coverage for prosthetic eyewear; by permitting U.S. Vision President Schwartz to testify that he believed Opti-Center's Medicare billing practices were improper; and by allowing various Opti-Center employees to testify that they had informed their superiors in the company that its Medicare billing practices did not conform to those employed by other optometrists. We find no merit in any of these contentions.
 
 
 39
 With regard to the testimony of Cioffi and Lord, appellants raise a variety of complaints. They object that there was no showing that the subject matter of their testimony was one as to which the trier of fact might require assistance; that Lord and Cioffi could not properly qualify as expert witnesses under Fed.R.Evid. 702; and that their testimony improperly constituted opinions as to the legal implications of the defendants' conduct. The implausibility of the first of these contentions is best illustrated by the fact that Dr. Gold's entire defense turned on the argument that a trained optometrist who had been in the optical business for thirty-five years might not understand what types of eyewear were eligible for Medicare. Appellants' second objection is equally devoid of merit. A trial judge has broad discretion in deciding whether to qualify a witness as an expert, and his action must be sustained on appeal unless it is manifestly erroneous. See United States v. Costa, 691 F.2d 1358, 1361 (11th Cir.1982). Lord was chief of HCFA's Coverage and Eligibility Policy Section for the southeastern region and had been working in Medicare for nine years, and Cioffi had received special training concerning Medicare and was a three-year veteran of the Office of Investigations within the Inspector General's Office of HHS. We therefore conclude that the trial judge was within his discretion in finding that they could qualify as expert witnesses.
 
 
 40
 Nor do we believe that the trial court erred by permitting Lord and Cioffi to testify as to whether particular claims filed by Opti-Center were in their opinions eligible for reimbursement under Medicare. It is well established that Fed.R.Evid. 704 permits a witness to express an opinion as to an ultimate issue that must be decided by the trier of fact. United States v. Miller, 600 F.2d 498, 500 (5th Cir.), cert. denied, 444 U.S. 955, 100 S.Ct. 434, 62 L.Ed.2d 327 (1979). In addition, this court has expressly approved the use of expert legal testimony in a case where an IRS agent "merely stated his opinion as an accountant [with regard to the tax consequences of a transaction], and did not attempt to assume the role of the court." United States v. Fogg, 652 F.2d 551, 556-57 (5th Cir. Unit B 1981), cert. denied, 456 U.S. 905, 102 S.Ct. 1751, 72 L.Ed.2d 162 (1982); see also United States v. Schafer, 580 F.2d 774, 778 (5th Cir.), cert. denied, 549 U.S. 970, 99 S.Ct. 463, 58 L.Ed.2d 430 (1978); United States v. Milton, 555 F.2d 1198, 1204 (5th Cir.1977). Because the trial judge here was careful to instruct the jury about the weight that should be given expert testimony such as that offered by Lord and Cioffi, we conclude that his decision to admit their opinions was proper.[10]
 
 
 41
 Dr. Gold and Opti-Center also attack the trial court's decision to permit William Schwartz to testify that the volume of cataract eyewear sales at Opti-Center prior to its purchase by U.S. Vision was "excessive", and that Medicare-related sales at the Tampa area stores "disappeared" after U.S. Vision revised the procedures for handling Medicare claims to conform with its own understanding of the statutory requirements. Appellants raise a barrage of objections to this testimony, contending that it was irrelevant, prejudicial, and constituted improper "opinion" evidence. We believe that it is self-evident that Schwartz' testimony was highly relevant to the issue of whether Opti-Center's practices were proper or improper. Fed.R.Evid. 701 permits opinion testimony by lay witnesses if the opinions offered "are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." Schwartz' statement that he considered the volume of cataract sales at Opti-Center "excessive" was based on his own examination of the store's records--he testified that between twenty-five and forty percent of all sales were cataract-related--and his personal experience in the optical business. Because his opinion was based on "first-hand knowledge or observation" and was "helpful in resolving issues" that were critical in this case, Fed.R.Evid. 701 advisory committee note, we conclude that the trial judge did not err in admitting his testimony.
 
 
 42
 Nor do we find merit in the objections raised by Dr. Gold and Opti-Center to the admission of testimony from three former Opti-Center employees--Nancy Shepard, Flossie Gousha, and Debbie Develle--who all testified that they had informed their superiors at the company that its Medicare billing practices did not accord with those used by their prior employers in the optical field. Appellants contend that their testimony constituted hearsay and improper opinion evidence, but these objections indicate that they misperceive the nature and relevance of this testimony. The testimony of these witnesses was important not because they were experts on Medicare, but because they had put their superiors on notice that there was reason to question whether Opti-Center's billing practices were in compliance with the law. Their testimony was therefore useful because it established that the conspirators had reason to know that their activities were illegal; it was not admitted to prove that the interpretation these witnesses had of the Medicare program was necessarily the correct one.[11]
 
 2. Use of Rebuttal Testimony
 
 43
 Appellant Warren objects to the government's presentation of rebuttal testimony against her by Mary Conway and Michael Covington. Covington testified on rebuttal that he had told Warren in June of 1981 about a newspaper article he had read concerning "someone in the medical field [who] had come into some trouble for not collecting the twenty percent" deductible a Medicare patient was supposed to pay. Opti-Center had generally not billed its Medicare customers for this amount. Mary Conway testified on rebuttal that in June or July of 1981, Warren instructed her to alter Opti-Center's internal records to indicate that the company had in fact been billing its customers for their required contribution. Appellant Warren asserts that this testimony was improperly admitted because it was new evidence that did not rebut anything she had presented in her defense. In fact, however, Warren had flatly denied on cross-examination that she ever discussed such a report with Covington. The purpose of rebuttal evidence is " 'to explain, repel, counteract, or disprove the evidence of the adverse party,' " United States v. Delk, 586 F.2d 513, 516 (5th Cir.1978) (emphasis omitted) (quoting Luttrell v. United States, 320 F.2d 462, 464 (5th Cir.1963)), and the decision to permit rebuttal testimony is one that resides in the sound discretion of the trial judge. Geders v. United States, 425 U.S. 80, 86, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976); United States v. Sadler, 488 F.2d 434, 435 (5th Cir.), cert. denied, 417 U.S. 931, 94 S.Ct. 2642, 41 L.Ed.2d 234 (1974). We find no error in the district court's decision to permit Covington and Conway to testify in response to Warren's earlier statements, and we believe that the trial judge's refusal to permit Warren to re-take the stand was also within the permissible scope of his discretion.
 
 
 44
 E. Reading of Highsmith's Grand Jury Testimony
 
 
 45
 During the presentation of its case in chief, the government sought to offer defendant Highsmith's grand jury testimony into evidence against him in order to establish that he had engaged in double cataract sales and other allegedly illegal practices when he worked for Opti-Center. His co-defendants Warren and Dr. Gold raised objections based on the sixth amendment's confrontation clause, because Highsmith had asserted in his testimony that his sales practices were based on the instructions he had received from his superiors in the company. The trial judge decided to delete certain questions and answers from the transcript in order to avoid possible prejudice to Highsmith's co-defendants. Highsmith objected, contending that the excision of these passages distorted his testimony and would leave the jury with the false impression that he had committed these allegedly improper acts on his own initiative. While recognizing that Fed.R.Evid. 106 permits the trial judge to decide whether "fairness" requires that a recorded statement must be offered in its entirety, Highsmith contends that the trial judge erred in this instance. He argues that the deleted testimony was essential to his defense that he was merely acting in accordance with company policy, whereas the potential prejudice to his co-defendants was slight because the challenged testimony was merely cumulative of that already offered by Gilbert and Sue Conway.
 
 
 46
 We find no merit in Highsmith's argument. This court has refused in several cases to find that a trial judge erred by deleting portions of a confession that implicated a co-defendant before it was read to the jury, see, e.g., United States v. Kershner, 432 F.2d 1066, 1071 (5th Cir.1970); Posey v. United States, 416 F.2d 545, 551 (5th Cir.1969), and we see no reason that we should be more inclined to trespass upon the trial judge's discretion in this context. In any event, Highsmith's claim that he was prejudiced by these deletions ultimately rests upon a novel and untenable argument: the assertion that he should escape liability for his criminal acts because he was simply following the instructions of his company superiors. We will consider this argument in more detail in the section F., infra.
 
 F. Jury Instructions
 
 47
 Dr. Gold, Opti-Center and Highsmith each raise various objections to the jury charge employed by the trial judge. Although a defendant is entitled to have the court instruct the jury on the theory of the defense, provided it has some foundation in the evidence and legal support, United States v. Terebecki, 692 F.2d 1345, 1351 (11th Cir.1982), the district court has broad discretion in formulating its charge as long as the charge accurately reflects the law and the facts. United States v. Borders, 693 F.2d 1318, 1328-29 (11th Cir.1982), cert. denied, 461 U.S. 905, 103 S.Ct. 1875, 76 L.Ed.2d 807 (1983). A trial judge's refusal to give a requested instruction constitutes reversible error only if (1) the instruction is substantively correct; (2) it was not substantially covered in the charge actually delivered to the jury; and (3) the failure to give it seriously impaired the defendant's ability to present an effective defense. United States v. Walker, 720 F.2d 1527, 1541 (11th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 1614, 80 L.Ed.2d 143 (1984). We conclude that none of the objections raised by the appellants satisfies this standard.
 
 1. Dr. Gold
 
 48
 Dr. Gold complains that the trial court erred by not giving his requested instructions 15, 16, 17, 18, and 19, and asserts that the instruction on specific intent employed by the trial court was incorrect under United States v. Satterfield, 644 F.2d 1092 (5th Cir. Unit B 1981). He also contends that the trial court gave an instruction that improperly shifted the burden of proof and was without evidentiary support. Dr. Gold's requested instruction 15 basically tracked the language of 42 U.S.C. Sec. 1395y(a)(1)(A), which provides that no payment may be made under Medicare Part B for "items and services ... [which] are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." The trial judge refused to use this instruction because he felt it would be inappropriate to single out "one isolated statute" for special attention in the charge, noting that there had been extensive expert legal testimony in the case during which the defense could have brought the statutory provision in question to the attention of the jury. We do not believe this was an unreasonable position for the trial judge to take, particularly since the basic point addressed by the provision--that payment under Medicare can be made only for expenses that are a medical necessity--had been brought out in the testimony of various witnesses and was not a subject of real dispute in the case. The issues that were in controversy were (1) whether Dr. Gold was aware of the sales practices of his subordinates and (2) whether sunglasses for cataract patients were a medical necessity. Dr. Gold's counsel was free to argue the second point in his summation to the jury and he in fact did so; we therefore cannot conclude that Dr. Gold suffered any prejudice as a result of the denial of this instruction.
 
 
 49
 For similar reasons, Dr. Gold's proposed instruction 17 was also rejected by the trial court. This instruction was based on the language of 42 C.F.R. Sec. 405.232c, which provides that "[t]he prescription or order of a doctor of optometry will be accepted as evidence of the medical need for prosthetic lenses." Dr. Gold contends that this instruction was critical to the theory of his defense, reasoning that this provision indicates that no new prescription is necessary in order to supply cataract eyeglasses to a Medicare patient and to subsequently claim reimbursement from Medicare. This is a debatable construction at best, and the proper way to have brought this interpretation to the jury's attention would have been to raise it during the cross-examination of Curtis Lord, who testified extensively about other federal regulations that are relevant to Medicare eligibility. Nevertheless, Dr. Gold's counsel did present this interpretation of the regulation to the jury during his closing argument, and we therefore do not believe that the trial judge's refusal to deliver this instruction in any way prejudiced Dr. Gold's defense.
 
 
 50
 Dr. Gold's requested instructions 16 and 18 both stressed that the Carrier's Manual and the circulars explaining Medicare eligibility that Blue Cross occasionally sent out to health care providers were not law and that the defendants were not presumed to have knowledge of them. The nature of the Carrier's Manual and the newsletters were adequately set forth in the testimony of various witnesses, however, and defense counsel argued the notice issue quite thoroughly in their summations to the jury. Because it was ultimately up to the jury to decide as a factual matter whether the defendants' protestations of ignorance were credible, we cannot hold the trial judge in error.
 
 
 51
 Dr. Gold also objects to the trial court's rejection of his proposed instruction 19, which stated:
 
 
 52
 If you find that a defendant in this case was ignorant, or had no knowledge, of any law or regulation, then that defendant cannot be found guilty. If, after considering all of the evidence, you have a reasonable doubt as to whether a defendant knew of a particular law or regulation, then that would mean that the government had not proven specific intent beyond a reasonable doubt.
 
 
 53
 The trial judge instead gave the following charge:
 
 
 54
 It is not necessary for the government to prove that a defendant knew that a particular act or failure to act is a violation of law. However, evidence that a defendant acted or failed to act because of ignorance of the law is to be considered by the jury in determining whether or not that defendant acted or failed to act with specific intent, as charged.
 
 
 55
 Although Dr. Gold asserts that the language of his proposed instruction was approved by this court in United States v. Satterfield, 644 F.2d 1096, his version of the instruction is far broader. Its suggestion that ignorance "of any law or regulation" (emphasis added) would be a complete defense is a misreading of Satterfield[12] and a misstatement of existing law. This court and others have held that the defense of ignorance of the law is a consideration in specific intent crimes, but none has gone so far as to invalidate the presumption of knowledge of the law.[13] We conclude that the instruction used by the trial court accurately stated the law. Its language essentially tracked that of the model charge suggested on this issue in Devitt & Blackmar, Federal Jury Practice and Instructions, Sec. 14.01, which was at least implicitly approved by this court in United States v. Schilleci, 545 F.2d 519, 523-24 (5th Cir.1977). See also United States v. Davis, 583 F.2d 190, 194 & n. 3 (5th Cir.1978).
 
 
 56
 It is well established "[a]lthough a defendant may request a specific instruction the court is not obligated to use the exact wording of the proposed instruction as long as the words chosen clearly and accurately state the proposition being requested." United States v. Duff, 707 F.2d 1315, 1320-21 (11th Cir.1983). In this case the trial judge's charge was clearly a correct statement of the law and reflected his awareness of the need to strike a proper balance between the government and the defense. We find no fault with his choice.
 
 
 57
 Finally, Dr. Gold contends that the trial judge erred in his instructions to the jury on the issue of whether the defendants could be found to have knowingly acted in violation of the law. The contested instruction states:
 
 
 58
 It is not [sic] necessary that you find beyond a reasonable doubt that any act you may have found to have been committed by a defendant was done or committed knowingly. In this connection, however, you are instructed that a person who makes a claim or a statement or causes a claim or a statement to be made with reckless disregard for the truthfulness of the claim or statement and with a conscious purpose to avoid learning the knowledge of the claim or statement is deemed to have knowledge of the claim or statement and its truthfulness or lack thereof.
 
 
 59
 Dr. Gold asserts that this instruction was erroneous because the "not" in the first sentence improperly shifted the burden of proof to the defendants and because there was no evidentiary basis for the instruction on "conscious avoidance," as required by the courts in such cases as United States v. Garzon, 688 F.2d 607, 609 (9th Cir.1982), and United States v. Murrieta-Berjarano, 552 F.2d 1323, 1325 (9th Cir.1977). We find neither contention persuasive.
 
 
 60
 While it is true that it would have been incorrect for the instructions to state that the jury did not have to find beyond a reasonable doubt that the defendants had committed their criminal acts knowingly, there is some dispute among the attorneys involved in this case as to whether the offending word "not" was actually used or is simply a court reporter's error. It apparently did not appear in the draft of the court's instructions that was distributed to counsel for their examination prior to closing arguments, and none of the defense counsel raised an objection on this point after the instructions were read to the jury. Even if the judge's clerk did inadvertently include the word "not" while reading the instructions to the jury, however, we believe that this error was clearly harmless beyond a reasonable doubt. Fed.R.Crim.P. 52(a); Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). The trial judge here permitted the jury to take a copy of the instructions (in which the error did not appear) with them when they retired to deliberate, thus reducing the likelihood that a casual mistake could have had an improper effect. In addition, our review of this issue must also be guided by the established rule that "each statement made by a judge to the jury should be examined in light of the entire charge and that isolated statements which appear prejudicial when taken out of context may be innocuous when viewed in light of the entire trial." United States v. McCoy, 539 F.2d 1050, 1063 (5th Cir.1976), cert. denied, 431 U.S. 919, 97 S.Ct. 2185, 53 L.Ed.2d 230 (1977). The trial judge repeatedly emphasized that it was the government's burden to prove beyond a reasonable doubt; all the elements of the crimes with which the defendants were charged immediately before the instructions in question, he also informed the jury that "[t]o establish specific intent, the government must prove that a defendant knowingly did an act which the law forbids, or knowingly failed to do an act which the law requires, purposely intending to violate the law." Thus, when viewed in the context of the charge as a whole, we conclude that this error was harmless even if the disputed word was inadvertently included in the instructions read to the jury.
 
 
 61
 Dr. Gold's objection to the "conscious avoidance" instruction also need not detain us long. The language employed by the trial judge has been approved by this court in United States v. Cook, 586 F.2d 572, 579-80 (5th Cir.1978), cert. denied, 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274 (1979). There was clearly enough evidence presented here on the issue of conscious avoidance or deliberate ignorance to justify supplying an instruction on this issue to the jury. The entire defense case, after all, rested on the argument that the defendants--despite their supervisory responsibilities and "hands-on" management style--were innocently oblivious to the endemic fraud that permeated Opti-Center's entire Tampa Bay area operation. In addition, the record was replete with testimony that suggested indifference by the defendants at best and deliberate criminality at worst. Despite warnings from a number of Opti-Center employees that their claims practices were illegal, for example, none of the defendants even picked up a telephone to call Blue Cross's toll-free number to determine what expenses were covered by Medicare. There was also direct testimony from Sue Conway that on one occasion when she tried to tell Warren that she had done some illegal things with Medicare billings, Warren responded that she did not want to hear about it. We therefore have no difficulty concluding that the "conscious avoidance" instruction here was amply justified by the evidence presented at trial.
 
 2. Opti-Center
 
 62
 Opti-Center similarly challenges the instruction employed by the district court on the issue of corporate liability. The relevant portion of the charge read as follows:
 
 
 63
 To find a corporate defendant guilty, you must find beyond a reasonable doubt that all the essential elements in the offense as set forth in these instructions are present to the corporation in the form of acts or omissions of its agents, which were performed within the scope of their employment. Whether the agents' acts or omissions were committed within the scope of their employment is a question of fact. To be acting within his employment, the agent first must have intended that his act would have produced some benefit to the corporation or some benefit to himself and the corporation second.
 
 
 64
 Opti-Center's complaint concerns the final sentence cited above, which it asserts is an erroneous statement of the law under Standard Oil Co. v. United States, 307 F.2d 120 (5th Cir.1962). Opti-Center asserts that the district court erred by not adopting its proposed instructions numbers 12, 13 and 14, which highlighted the holding in Standard Oil that "the purpose to benefit the corporation is decisive in terms of equating the agent's action with that of the corporation." Id. at 128. To the extent that Opti-Center's requested instructions implied that an agent had to be acting for the exclusive benefit of the corporation for corporate liability to exist, however, they clearly misstate the law. The court in Standard Oil was faced with the question of whether a corporation could be held liable in a case where the criminal acts of its employees "not only did not benefit the employer, but in some instances, at least, result[ed] in a theft of its property." Id. at 122. In this case, in contrast, the criminal acts of Opti-Center employees redounded to the benefit of both the corporation (which received the revenues generated by the improper claims) and its employees (who received bonuses based on their sales volume). The district court here therefore faced the question of how to treat the actions of employees who could be simultaneously pursuing both their own interests and those of their corporate employer--a situation which is markedly different from that which faced the Standard Oil court. The language employed by the district court here is clearly supported by Prosser's statement that "in general the servant's conduct is within the scope of his employment if it is of the kind he is employed to perform, occurs substantially within the authorized limits of time and space, and is actuated, at least in part, by a purpose to serve the master." Prosser, Torts Sec. 70 at 461 (4th ed. 1971) (emphasis added). See also United States v. Beusch, 596 F.2d 871, 877-78 & n. 7 (9th Cir.1979); United States v. Demauro, 581 F.2d 50, 54 & n. 3 (2d Cir.1978). Because the charge utilized by the district court both accurately stated the law and properly reflected the distinct facts of this case, we must reject the argument advanced by Opti-Center.
 
 3. Highsmith
 
 65
 The final objection to the court's jury instructions is raised by Highsmith, who challenges the trial judge's refusal to charge the jury as follows:
 
 
 66
 With respect to Defendant Gary Highsmith, if you determine that he prepared or submitted the Medicare claims alleged and described in the indictment in the counts pertaining to him and that he did so as instructed by his employers and superiors obeying their orders and instructions and following their standard office procedure, then you must find him not guilty.
 
 
 67
 The only authority Highsmith can produce in support of this rather novel view of the law is a casual statement in United States v. Bernstein, 533 F.2d 775 (2d Cir.), cert. denied, 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976), where the court found that the appellant's counsel had a possible conflict of interest because "there was a probability of conflicting and inconsistent defenses based upon corporate and individual liability, since as an employee of ESC Behar could well take the stand and present a defense that her employers were the guilty ones because she was only obeying the orders of her superiors and following standard office procedure." Id. at 788. What Highsmith has failed to understand, however, is that "following orders" can only be a defense where a defendant has no idea that his conduct is criminal--a critical limitation that Highsmith's proposed instruction does not reflect. If Highsmith was aware of the illegality of his conduct, the fact that it was authorized by a superior clearly cannot insulate him from criminal liability. McNamara v. Johnston, 522 F.2d 1157, 1165 (7th Cir.1975), cert. denied, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976); United States v. Boyle, 482 F.2d 755, 764 (D.C.Cir.), cert. denied, 414 U.S. 1076, 94 S.Ct. 593, 38 L.Ed.2d 483 (1973); Susnjar v. United States, 27 F.2d 223, 224 (6th Cir.1928). If, on the other hand, Highsmith was genuinely ignorant of the criminal nature of his actions, then he was not guilty because he lacked the knowledge and specific intent necessary to be convicted under the applicable statutes. Since the trial court carefully instructed the jury that they must find that the defendants had acted knowingly and willfully in order to convict them, we conclude that there is no merit to appellant Highsmith's objection.
 
 G. Sufficiency of the Evidence
 
 68
 All of the appellants challenge their convictions on the grounds that the evidence presented at trial was insufficient to sustain the guilty verdicts returned by the jury. In reviewing claims attacking the sufficiency of the evidence, we of course must view the record in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and we must make all reasonable inferences and credibility choices in support of the jury's verdict. United States v. Middlebrooks, 618 F.2d 273, 278 (5th Cir.), cert. denied, 449 U.S. 984, 101 S.Ct. 401, 66 L.Ed.2d 246 (1980); United States v. Becker, 569 F.2d 951, 959 (5th Cir.), cert. denied, 439 U.S. 865, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978). If the evidence presented at trial would permit a reasonable trier of fact to conclude that the defendant is guilty beyond a reasonable doubt, then the convictions must be upheld, even if the evidence does not necessarily exclude every reasonable hypothesis of innocence. United States v. Bell, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), aff'd on other grounds, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).
 
 
 69
 1. The Conspiracy Count: 18 U.S.C. Sec. 371
 
 
 70
 All four appellants contend that the evidence was insufficient to justify their convictions on count one of the indictment, which charged them with conspiracy to defraud the United States by submitting fraudulent Medicare claims forms in violation of 18 U.S.C. Sec. 371. Dr. Gold, Opti-Center and Warren argue that the evidence established only that Sue Conway, Howard Gilbert, and other low-level Opti-Center employees had independently committed the allegedly illegal acts, either out of ignorance of the Medicare regulations or from a desire to advance their own fortunes within the company. Highsmith asserts that since he was simply following his employer's instructions, he lacked the necessary criminal intent and his conviction on this count cannot stand.
 
 
 71
 In order to sustain a conviction for conspiracy, the government must present evidence sufficient to establish beyond a reasonable doubt that a conspiracy existed, that the defendant knew of the conspiracy, and that the defendant intended to join or associate himself with the objective of the conspiracy. United States v. Slocum, 708 F.2d 587, 594 (11th Cir.1983). The defendant must be aware of the essential nature and scope of the criminal enterprise, although it is not necessary that the individual members of the conspiracy know all the details of its operations. United States v. Conroy, 589 F.2d 1258, 1269 (5th Cir.), cert. denied, 444 U.S. 831, 100 S.Ct. 60, 62 L.Ed.2d 40 (1979). Direct proof of a formal agreement is not necessary to establish the existence of a conspiracy, since "[t]he very nature of conspiracy frequently requires that the existence of an agreement be proved by inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." United States v. Ayala, 643 F.2d 244, 248 (5th Cir. Unit A 1981); United States v. Tolliver, 665 F.2d 1005, 1007 n. 1 (11th Cir.), cert. denied, 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 455 (1982).
 
 
 72
 After a careful review of the record, we conclude that there was sufficient evidence to support the jury's verdict against each defendant on the conspiracy count. We begin with the case against Dr. Gold. Despite his claims to the contrary, there was evidence presented from which the jury could have concluded that Dr. Gold was in fact aware of what Medicare would and would not reimburse in the optical area. In addition to the fact that he had signed pleadings indicating that he had received statements on Medicare eligibility in the early and mid-1970's, Dr. Gold went to some lengths to keep William Schwartz from examining Opti-Center's Medicare files prior to the sale of the company to U.S. Vision. When Schwartz did examine the files and subsequently questioned Dr. Gold about the apparent irregularities he observed, Dr. Gold denied any knowledge of these and sought to explain them as "mistakes"--although there was in fact testimony from Opti-Center employees that he was well aware of such practices as spacing out the dates on Medicare claims when a double cataract sale was made. The jury may well have decided that these actions were inconsistent with Dr. Gold's protestations of innocence, and we do not believe that this conclusion was inherently unreasonable.
 
 
 73
 Dr. Gold contends that such episodes as the "ditch the records" conversation cannot be relied upon to establish his participation in the conspiracy, since the Supreme Court has held that the mere fact that a person "receives, relieves, comforts or assists" one who has been a member of an aborted or completed conspiracy does not make him a participant in the conspiracy or liable for substantive crimes committed during the pendency of the conspiracy. See Bollenbach v. United States, 326 U.S. 607, 610-11, 66 S.Ct. 402, 404, 90 L.Ed. 350 (1946). As Judge Friendly has noted, however, this does not mean "that a person's efforts to assist in the concealment of a conspiracy may not be such as to support an inference that he had joined it while it was still in operation." United States v. Freeman, 498 F.2d 569, 576 (2d Cir.1974). We believe that there was certainly substantial evidence in this case to support the conclusion that Dr. Gold had promoted this criminal venture and made it his own. United States v. Falcone, 109 F.2d 579, 581 (2d Cir.), aff'd, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940). He was, after all, the principal beneficiary of the fraudulent claims, and his efforts to cover up the conspiracy before the sale of his company to U.S. Vision suggest that he was primarily concerned with protecting himself rather than protecting any of his subordinates from possible criminal liability.
 
 
 74
 For the reasons set forth in our discussion of the jury instructions on corporate liability, we also conclude that there was sufficient evidence to support the jury's finding that Opti-Center was also a party to the conspiracy. The employees who filed the improper Medicare claims were acting first and foremost in the company's interests, since it received the lion's share of the additional profits garnered by their illegal activities. The evidence also established that these fraudulent practices soon became company policy, and were followed at every Opti-Center store in the Tampa Bay area. Employees who raised too many questions found themselves ignored or demoted. We therefore must reject the appellant's claim that the illegal practices were the actions of isolated employees independently seeking to advance their own careers without regard to the company's interests. This argument simply collapses under the weight of the evidence to the contrary.
 
 
 75
 We also find Warren's objections to her conviction on this count to be without merit. Warren repeatedly brushed aside warnings from Opti-Center employees that the company's Medicare billing practices were inconsistent with those of other optometrists in the area, despite the fact that she could easily have called Blue Cross to confirm or refute their misgivings. At least one of these employees--Linda Robinson, manager of the Tampa Bay Center--was demoted shortly after she raised these concerns with Warren. Warren also refused to listen when Sue Conway came to her and confessed that she had been doing illegal things with Medicare billings. It was Warren and Howard Gilbert who first initiated the practice of spacing out the service dates when two pairs of glasses were sold to a single customer; she also instructed Mary Conway that it was not necessary to provide an accurate explanation for the refunds that the company decided to make in the spring of 1981, and she participated in removing the Medicare sales records from the stores after Sue Conway overheard her telling Dr. Gold that "we can't just ditch the records." In view of these actions and the additional fact that Warren, to an even greater degree than Dr. Gold, carefully monitored the operations of the individual stores on a daily basis, we conclude that the jury could reasonably decide that she was a part of the conspiracy.
 
 
 76
 Highsmith's claim can be quickly dismissed as well. Although he asserts that he was merely "following orders," he continued to make double cataract sales long after his superiors had instructed him to stop doing so in April 1981. When Mary Conway began her examination of the records at Highsmith's Lakeland store in June 1981, she found that he frequently had billed Medicare for glasses that were never even made. An examination of his "cataract city" file by Sue Conway a year earlier had revealed that he always used the same procedure codes, description and price on the 1490 forms regardless of what type of glasses he had actually sold--despite the fact that every claim form contained a statement warning that it was a federal crime to supply false information. Highsmith also did not appear particularly alarmed when others questioned him about the widespread evidence of fraud in his files; he instead teased Mary Conway about Frank Cioffi's investigation, joking that "We are all going to go to Alcatraz." We therefore conclude that there was sufficient evidence against Highsmith on the conspiracy count to permit a reasonable trier of fact to find him guilty.
 
 
 77
 2. The Substantive Counts: 18 U.S.C. Secs. 287 and 1001
 
 
 78
 With regard to the substantive counts, the arguments advanced by Dr. Gold, Opti-Center and Warren are somewhat different from those advanced by Highsmith. The first three appellants contend that since they did not actually sign or submit any of the false Medicare claims, the government must establish that they were guilty of aiding and abetting the criminal acts of their subordinates. Highsmith once again raises his ill-fated "following orders" defense and also specifically challenges the sufficiency of the evidence against him on count twenty-five, which charges a violation of 18 U.S.C. Sec. 1001.
 
 
 79
 The defendants were not charged in the indictment as aiders and abettors under 18 U.S.C. Sec. 2, so it is unnecessary for us to explore the contours of the law of aiding and abetting. Once we have concluded that the evidence was sufficient to establish that all of these defendants were members of the conspiracy, they can each be held liable for the substantive offenses committed by their co-conspirators that were within the scope of the conspiracy and in furtherance of its objectives. Pinkerton v. United States, 328 U.S. 640, 647, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946); United States v. Smith, 680 F.2d 255, 261 (1st Cir.1982), cert. denied, 459 U.S. 1110, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983). We believe that the evidence presented at trial was sufficient to demonstrate that false statements were made on the Medicare claims cited in counts two through forty of the indictment; appellants essentially concede as much themselves. Because these fraudulent submissions were clearly acts within the scope of the conspiracy, the appellants can be held liable despite the fact that they never personally submitted a fraudulent claim.
 
 
 80
 We have rejected Highsmith's "following orders" defense, so we can also dispose of his remaining objections to the sufficiency of the evidence. The only count to which Highsmith raises any specific objection is count twenty-five, which involved a claim submitted on behalf of Herbert Mansbridge from the Opti-Center store at the Floriland Mall in August 1980. Although the claim was apparently signed with Highsmith's signature, he never worked at the Floriland Mall store; moreover, Mansbridge testified that he was serviced by a black salesperson, whereas Highsmith is white. We need not resolve this conflict, however, since the penalty imposed on count twenty-five--an eighteen-month suspended sentence and three years' probation--runs concurrently with that imposed on counts twenty-four and thirty-one. There is no necessity that we review a conviction when the sentence is concurrent with that of another unchallenged or upheld conviction, United States v. Johnson, 700 F.2d 699, 701 (11th Cir.1983), and Highsmith's counsel acknowledged at oral argument that reversal of the conviction on count twenty-five would have no effect on the length of his client's incarceration or parole.
 
 III. CONCLUSION
 
 81
 After a careful review of the record in this case, we conclude that the objections raised by the appellants are without merit. The convictions and sentences imposed on appellants Dr. Gold, Warren, Opti-Center, and Highsmith are therefore
 
 
 82
 AFFIRMED.
 
 
 
 [1]
 Defendants Gold, Warren, and Opti-Center, Inc. were convicted on one conspiracy count and thirty-nine substantive counts. Defendant Highsmith was convicted on one conspiracy count and seven of the eight substantive counts with which he was charged. An additional defendant named in the original indictment, Sue Conway, pleaded guilty to one conspiracy and one substantive count prior to the commencement of the trial, where she testified for the government. Dr. Gold was sentenced to three years incarceration, to be followed by three years probation, as well as a $1,000 fine on each count. Defendant Warren received a sentence of two years incarceration and three years probation, while defendant Opti-Center was sentenced to pay a $120,000 fine. Defendant Highsmith received a sentence of eighteen months to be followed by three years probation, while defendant Conway was sentenced to a prison term of a year and one day, followed by three years probation
 
 
 [2]
 The key provision of the Carrier's Manual for our purposes is Sec. 2130, which pertains to post-operative cataract eyewear. Sec. 2130 states:
 Payment may be made for one of the following combinations of prosthetic lens when determined to be medically necessary by a physician ... to restore essentially the vision provided by the crystalline lens of the eye: (1) prosthetic bifocal lenses in frames; (2) prosthetic lenses in frames for far vision, and prosthetic lenses and frames for near vision; or (3) when prosthetic contact lens(es) for far vision is prescribed (including cases of binocular and monecular [sic] aphakia) payment can be made for the contact lens(es) and the prosthetic lenses in frames for near vision to be worn at the same time as the contact lens(es) and prosthetic lenses and frames to be worn where the contacts have been removed.
 Payment cannot be made for cataract sunglasses obtained in addition to the regular (untinted) prosthetic lenses, since the sunglasses duplicate the restoration of vision function performed by the regular prosthetic lenses.
 
 
 [3]
 Neither Warren nor Gilbert ever seems to have considered raising the problem with Blue Cross itself, although its Jacksonville office maintained a toll-free telephone line to handle such inquiries
 
 
 [4]
 Since it was company policy that no glasses were to be made or delivered until payment was received, Medicare was often billed while Opti-Center was still waiting to obtain a prescription. Thus, Opti-Center sometimes collected reimbursements for glasses that were ultimately never made or delivered to the customer
 
 
 [5]
 Dr. Gold had earlier sold an eighty percent interest in Opti-Center to a businessman named George Underwood in March 1980. Underwood sold his shares back to Dr. Gold some six months later. During the period when Underwood owned a controlling interest, however, Dr. Gold remained with the company as a management consultant. According to Opti-Center employees, he continued to make regular telephone calls and visits to the individual stores in order to check their records, and there were no significant changes in the company's policies or procedures
 
 
 [6]
 Later that fall, however, after grand jury subpoenas had been served on a number of Opti-Center employees, Warren once again removed the company's Medicare records to her home. When Schwartz learned of this, he ordered her to return them to their respective stores or to the store where U.S. Vision officials had agreed to deliver them to the government
 
 
 [7]
 According to Schwartz, Dr. Gold had "demanded" that he not visit any of the stores before the sale was concluded
 
 
 [8]
 Schwartz also raised these improper claims with Warren. Her inability to provide a satisfactory explanation for the widespread irregularities resulted in her discharge from U.S. Vision in the autumn of 1981
 
 
 [9]
 Paragraph 9 of count one reads as follows:
 Beginning in or about October, 1979, and continuing until on or about July 23, 1981, at Tampa, in the Middle District of Florida, and elsewhere,
 DR. DONALD L. GOLD,
 PATRICIA M. WARREN,
 SUE A. CONWAY,
 GARY N. HIGHSMITH, and
 OPTI-CENTER, INC.,
 defendants herein, knowingly and willfully did combine, conspire, confederate and agree together and with various other persons both known and unknown to the grand jury to:
 (a) commit the following offenses against the United States:
 (i) to knowingly make and present, and cause to be made and presented, claims to Medicare, knowing such claims to be false, fictitious and fraudulent, in violation of Title 18, United States Code, Section 287; and
 (ii) to knowingly and willfully make and cause to be made false, fictitious and fraudulent statements and representations about material matters within the jurisdiction of the Health Care Financing Administration (Medicare), in violation of Title 18, United States Code, Section 1001; and
 (b) defraud the United States of its right to have the Medicare--Part B Program conducted honestly and free from deceit, corruption and fraud and to have the federal funds therein disbursed in accordance with the laws of the United States.
 
 
 [10]
 For a thoughtful discussion of the problems presented by the admission of expert legal testimony, see Note, Expert Legal Testimony, 97 Harv.L.Rev. 797 (1984)
 
 
 [11]
 Dr. Gold and Opti-Center assert as well that the district court erred by permitting Anna Kozuch, another former Opti-Center employee, to testify that it was a violation of Florida law for someone who was not supervised by a licensed optician to read a prescription off a lensometer. Because appellants' trial counsel failed to raise any objection to this testimony below, they cannot succeed on this issue unless they can establish that the challenged remarks were so prejudicial that they constituted plain or fundamental error. United States v. Fowler, 605 F.2d 181, 184 (5th Cir.1979), cert. denied, 445 U.S. 950, 100 S.Ct. 1599, 63 L.Ed.2d 785 (1980). The single statement by witness Kozuch at issue here, an isolated remark in a month-long trial, does not even approach this level of seriousness. If it was prejudicial to any of the defendants in this case, it would have been most prejudicial to Kozuch's supervisor, Sue Conway, who has not appealed her conviction. We therefore find that there was no plain error in the trial court's admission of this testimony
 
 
 [12]
 The instruction approved by this court in Satterfield stated:
 [I]f a defendant is ignorant of a law requiring a report, as an example in reference to transportation of money, then he cannot be found guilty.
 That if after considering all of the evidence, you have a reasonable doubt as to whether or not a defendant knew of the reporting requirements, then that would mean that the government had not proven specific intent or willfulness beyond every reasonable doubt.
 644 F.2d at 1096. As the trial judge correctly noted, there were critical differences between Satterfield and the present case that made it inappropriate to issue a similar instruction here. Satterfield involved a prosecution under 31 U.S.C. Secs. 1058 and 1101(b), which require any person entering this country to state on a customs declaration form if he is carrying monetary instruments worth more than $5,000. Anyone who makes such a declaration must fill out an additional form. The defendant was charged with giving false information on his customs declaration form and with failing to file the additional report. The instruction in Satterfield on which Dr. Gold relies was given for the latter offense and was appropriate in that context--absent notice on the customs declaration form itself or some proof of knowledge of the additional reporting requirement, the defendant could not be held responsible for failing to perform a duty of which he was unaware. In this case, in contrast, the defendants are charged with making false statements on a form that contained an explicit warning that such conduct was a federal crime--and with the knowledge that their false statements would lead the government to pay on an ineligible claim.
 
 
 [13]
 This court has held it erroneous for a trial judge to instruct that ignorance of the law is no excuse in a crime that requires specific intent. See, e.g., United States v. Davis, 583 F.2d 190, 194 (5th Cir.1978); United States v. Schilleci, 545 F.2d 519, 523-24 (5th Cir.1977). The most that the courts have done, however, is to leave the question to the jury instead of having it decided on the basis of the presumption of knowledge or an absolute defense of ignorance. The jury is allowed to decide whether or not ignorance of a specific law is demonstrated sufficiently to overcome the government's showing of intent to violate that law. See, e.g., Davis; Schilleci; United States v. Joly, 493 F.2d 672, 676 (2nd Cir.1974) (evidence may counteract inference of knowledge but will not make it disappear, especially when inference supported by other evidence); United States v. Squires, 440 F.2d 859, 863-64 (2nd Cir.1971)