**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Damian HAWKINS and Peter Hawkins,
Defendants–Appellants.**

No. 88–6242.

United States Court of Appeals,
Eleventh Circuit.

July 13, 1990.

L. Michael Roffino, P.A., Coral Gables, Fla., for Damian Hawkins.

Lori Barrist, Asst. Federal Public Defender, Miami, Fla., for Peter Hawkins.

Dexter W. Lehtinen, U.S. Atty., Thomas A.W. Fitzgerald, Linda Collins–Hertz, Michael G. Walleisa, and Dawn Bowen, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before JOHNSON, Circuit Judge, and HILL * and HENLEY **, Senior Circuit Judges.

JOHNSON, Circuit Judge:

The defendants, Damian Hawkins ("Damian") and Peter Hawkins ("Peter"), appeal from their convictions on five counts of mail fraud under 18 U.S.C.A. §§ 2 and 1341, and one count of conspiracy to commit mail fraud under 18 U.S.C.A. §§ 371 and 1341.

## I. STATEMENT OF THE CASE

In February 1986, Damian, then 19 years old, established a coupon-clipping business called the Federal Redemption Center ("FRC") in Miami, Florida, for the ostensible purpose of obtaining coupons for redistribution by paying participants or "homeworkers" a percentage of the face value of coupons sent in to FRC. Homeworkers were solicited by means of a national advertising campaign in periodicals such as *Globe* and *National Enquirer*. Applicants were required to send in a registration fee of $18 (later increased to $23) in order to receive a kit explaining the details of the program and instructions for sending in the coupons. The advertisements stated that homeworkers could earn $300 a week by sending in coupons to FRC; in fact, only a handful of participants earned that much, and there was evidence that such an earnings rate was impossible unless an individual had stored up coupons for years. Al-

---

* *See* Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

** Honorable J. Smith Henley, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

though the advertisements stated that FRC was "willing to pay you 10% to 30% of the face value of each coupon you clip and send us," the kit mailed to homeworkers following registration limited the brands and types of coupons which were acceptable, and indicated that only rare "no expiration date" coupons would be redeemed for 30%, rather than 10%, of face value.

An FRC advertisement appearing in *Globe* on July 1, 1986 stated that "[i]n an effort to help major manufacturers such as Kellogg's, General Mills, Pillsbury and many others increase the public's use of coupons, we at [FRC] have formed a coupon clipping and marketing division." In fact, FRC had not established any program for marketing coupons, and FRC never had any relationship with any coupon-issuing manufacturers. On June 23, 1986, the Ralston Purina Company wrote a letter to FRC in response to FRC's advertisements stating that FRC's purported use of coupons, in particular transfer and resale, would violate the terms and conditions of Ralston Purina coupons and render them void. On August 19, 1986, the Kellogg Company wrote FRC a letter protesting the unauthorized use of the "Kellogg's" trademark and the advertisement's false suggestion that FRC's program was carried on with the endorsement, cooperation, or knowledge of the Kellogg Company. FRC subsequently dropped specific manufacturers' names from its advertisements, but continued to assert that its program was carried on "[i]n an effort to help major manufacturers increase the public's use of coupons."

FRC's advertisements promised applicants a full refund of the registration fee within 45 days of receipt of the kit, if they were dissatisfied for any reason, and also promised to refund the fee if a participant subsequently failed to make $300 a week or an average of $900 a month. Applicants who sought refunds did not, however, receive checks in response to their requests. Instead, they were sent "Return Status Sheets" to be painstakingly filled out by them and returned before their requests for refunds were considered. Those who persisted by filling out and returning the forms were often sent refund checks, but numerous applicants received refund checks from FRC which were returned for insufficient funds or because they were written on closed accounts. Some applicants also failed to receive their kits in the first place after sending in their registration fees, and some participants received bad checks in payment for their shipments of coupons to FRC.

In June 1986, Damian's 24–year–old brother Peter joined FRC. Peter set up computer and telephone systems for FRC and became actively involved in the advertising and solicitation efforts. In August 1986, after receiving thousands of complaints from FRC participants, the Postal Service began an investigation. On October 21, 1986, investigators searched FRC's premises and seized its records. On the same day, the Postal Service executed a hold on FRC's mail. On November 25, 1986, FRC and the Postal Service entered into a consent agreement under which FRC was allowed to continue to operate, but was required to establish separate trust accounts for those participants registered before and those registered after October 21, 1986, inform all participants that an investigation was being conducted by the Postal Service, and offer all participants a refund option. In accordance with the consent agreement, the hold on FRC's mail was lifted in late December. In February 1987, continued investigation revealed that FRC was not mailing information required under the consent decree to all participants.

An indictment charging nine counts against both defendants was returned on September 24, 1987, of which counts 1 through 8 alleged substantive mail fraud offenses, and count 9 a conspiracy. Jury trial commenced on October 24, 1988. The district court entered judgments of acquittal on counts 3, 7, and 8 when certain Government witnesses failed to appear. On October 28, 1988, the defendants were convicted on all remaining counts. On December 14, 1988, the district court sentenced Damian to 36–month concurrent terms on the substantive counts, and sentenced Peter to 30–month concurrent terms

on those counts. Both defendants received consecutive 5–year terms of probation on the conspiracy count. On appeal, the defendants challenge the sufficiency of the evidence and certain evidentiary rulings by the district court.

## II. ANALYSIS

### A. *Authentication and Hearsay Issues*

A trial judge's evidentiary rulings will not be disturbed on appeal absent a clear abuse of discretion. *United States v. Kelly,* 888 F.2d 732, 743 (11th Cir.1989). Furthermore, evidentiary and other non-constitutional errors do not constitute grounds for reversal unless there is a reasonable likelihood that they affected the defendant's substantial rights; where an error had no substantial influence on the outcome, and sufficient evidence uninfected by error supports the verdict, reversal is not warranted. *See United States v. Stout,* 667 F.2d 1347, 1352 (11th Cir.1982); *United States v. Nill,* 518 F.2d 793, 802 (5th Cir.1975); Fed.R.Evid. 103(a). A defendant must specifically and timely object at trial to claimed errors, *see* Fed.R.Evid. 103(a)(1); errors claimed for the first time on appeal do not warrant reversal unless they constitute "plain error" amounting to a miscarriage of justice seriously affecting the fairness, integrity, or public reputation of the proceeding. *See United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985); Fed.R.Crim.P. 52(b).[1]

### 1. Authentication

Authentication is governed by Federal Rules of Evidence 901–903. The requirement is generally "satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a). There need be "only some competent evidence in the record to support authentication," which can consist of merely circumstantial evidence. *See United States v. Elkins,* 885 F.2d 775, 785 (11th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1300, 108 L.Ed.2d 477 (1990). Furthermore, Fed.R.Evid. 902(9) provides for the self-authentication of "[c]ommercial paper, signatures thereon, and documents relating thereto to the extent provided by general commercial law."

The defendants contend on appeal that six items admitted into evidence were not properly authenticated: (1) Government Exhibit 8, the August 1986 letter to FRC from the Kellogg Company, (2) Government Exhibit 15, a collection of checks written by FRC in April and May of 1986 which were returned because of "uncollected funds," (3) Government Exhibit 26, a check for $19.68 written by FRC to Sheila Davis on January 8, 1987, in payment for coupons sent by Davis to FRC, which was returned because of insufficient funds, (4) Government Exhibit 30, a check for $23 written by FRC to Martha Flickinger on January 8, 1987, in refund of Flickinger's registration fee, which was returned "account closed," (5) Government Exhibit 37, a check for $23 written by FRC to Marilyn Young on Janu-

---

**1.** The Government notes that with regard to some of the evidentiary issues as to which both defendants claim error on appeal, only Damian's counsel or only Peter's counsel raised any objection at trial. The record supports the Government's contention that the two defense counsel did not express, and did not appear to have, any coherent policy of stating objections on behalf of each other; on some occasions, both stated objections, and on one occasion, Damian's counsel objected while Peter's counsel specifically disclaimed any objection. In *United States v. Thevis,* 665 F.2d 616 (5th Cir. Unit B), *cert. denied,* 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303, 458 U.S. 1109, 102 S.Ct. 3489, 73 L.Ed.2d 1370, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982), this Court's predecessor, in the context of Fed.R.Crim.P. 30 (governing objections to jury instructions), noted that the

"'obvious purpose'" of a contemporaneous objection rule is to "'inform the trial judge of possible errors so that he may have an opportunity to correct them.'" *Id.* at 645 (quoting *Moore's Federal Practice*). Because this underlying purpose is served where at least one of two or more defense counsel raises an objection on a given point, we will apply normal appellate review as to both Damian and Peter on all evidentiary issues preserved by counsel for either defendant, despite our uncertainty as to whether both counsel intended at trial to preserve certain issues now raised on appeal. For future reference, however, we caution that separate defense counsel in joint trials would be well advised to reach an explicit understanding on the record with the trial judge regarding whether objections by counsel for one defendant apply to other defendants.

ary 8, 1987, in refund of Young's registration fee, which was returned "account closed," and (6) Government Exhibit 55, a collection of "Return Status Sheets," standardized forms used by FRC and filed in the regular course of business, on which dissatisfied applicants or participants recorded their reasons for requesting refunds and relevant identifying information.

■ No objection was raised at trial on any ground with regard to Exhibit 15, nor were any objections on authentication grounds raised with regard to Exhibits 37 or 55. Because any conceivable error as to these items falls far short of "plain error," the defendants' contentions as to these items fail in any event. Peter himself authenticated Exhibit 55 on Government cross-examination, however, by admitting that the "Return Status Sheets" contained therein were FRC documents. Furthermore, Exhibits 15 and 37, along with Exhibits 26 and 30 (to which proper objection was raised), constitute self-authenticating "commercial paper." *See* Fed.R.Evid. 902(9); UCC § 3–510 (adopted verbatim as Fla. Stat.Ann. § 673.510 (West 1966 & Supp. 1990)). As to Exhibit 8, to which proper objection was raised, Peter himself again provided the requisite authentication by admitting that the letter had been received by FRC and that he was familiar with it. The defendants' authentication claims are thus devoid of merit.

## 2. Hearsay

■ Federal Rule of Evidence 802 excludes hearsay evidence not falling within one of the exceptions in Rules 803 and 804. A statement is not subject to the hearsay rule, however, unless it is offered "to prove the truth of the matter asserted." Fed.R. Evid. 801(c); *see also United States v. Mazyak*, 650 F.2d 788, 792 (5th Cir. Unit B 1981), *cert. denied*, 455 U.S. 922, 102 S.Ct. 1281, 71 L.Ed.2d 464 (1982). Rule 803(6) provides an exception to the rule against hearsay for contemporaneous records or reports of events and conditions made in the regular course of business activity. Admission of hearsay under this exception requires evidence "sufficient to support the trustworthiness of the document, and to prove that it was prepared in the usual course of business." *United States v. Parker*, 749 F.2d 628, 633 (11th Cir.1984). It is not necessary that the person who actually prepared the business record testify, nor that the document be prepared by the business which has custody of it, so long as other circumstantial evidence suggests the trustworthiness of the record. *See id.*

The defendants challenge on hearsay grounds the admission of (1) the returned checks (Exhibits 15, 26, 30, and 37), and the testimony of Sheila Davis and Martha Flickinger relating to Exhibits 26 and 30, respectively, (2) the letters to FRC from Kellogg (Exhibit 8) and Ralston Purina (Exhibit 45), and testimony relating to Exhibit 45 by Dennis Szewzzyk, a manager in Ralston Purina's coupon division, (3) Exhibit 55 (the "Return Status Sheets"), and (4) testimony by Postal Inspector Dennis Collins regarding the number of complaints about FRC received by the Postal Service.

■ (1) The defendants challenge the returned checks constituting Exhibits 15, 26, 30, and 37 on the basis of the notations stamped on the checks by the banks indicating the reasons the checks were not honored, such as "insufficient funds" or "account closed." As noted above, the defendants failed to object, at least on hearsay grounds, to Exhibits 15 or 37. As to all four items, we conclude in any event that the stamped notations constitute a form of business record falling within the scope of Rule 803(6). Under the language of Rule 803(6), such notations constitute a contemporaneous "record" of the "condition" of the relevant bank account, made by a bank employee with the requisite "knowledge ... in the course of a regularly conducted business activity," where "it was the regular practice of that business activity to make the ... record." There is ample circumstantial evidence in the instant case supporting the trustworthiness of the notations, and that they were in fact made in the regular course of the bank's

business.[2]  No separate objections were raised at trial to the testimony of Davis or Flickinger, which merely duplicated, as to the issue under discussion, the evidence on the face of the checks.

■ (2) As to Exhibit 45, the June 1986 letter to FRC from Ralston Purina, the Government stipulated, and the district court carefully instructed the jury, that the letter was admitted, not for the truth of its contents, but for the fact that it gave notice to FRC that its advertised claims were unauthorized and inconsistent with the terms and conditions of Ralston Purina coupons. *See United States v. Gold,* 743 F.2d 800, 818 (11th Cir.1984), *cert. denied,* 469 U.S. 1217, 105 S.Ct. 1196, 84 L.Ed.2d 341 (1985) (hearsay statements admissible to prove notice).  Furthermore, it is clear from Dennis Szewzzyk's testimony that he relied upon his direct personal knowledge in confirming that Exhibit 45 accurately reflected Ralston Purina's policies and the terms and conditions of its coupons.  Thus, even if it had been admitted for substance, Exhibit 45 merely duplicated evidence properly admitted by a non-hearsay route.  As to Exhibit 8, the Kellogg letter, the district court failed to repeat the limiting instruction it gave regarding Exhibit 45.  Any error, however, did not prejudice the defendants' substantial rights.  The defendants did not dispute at trial that FRC never had any authorized relationship with manufacturers such as Kellogg.

■ (3) The "Return Status Sheets" constituting Exhibit 55 were properly admitted as business records under Rule 803(6). There is more than ample evidence of their status as such from the testimony of both Dorothy Kaczmarski, a former FRC employee, and Peter himself.

■ (4) Postal Inspector Collins's testimony was properly admissible to explain why the investigation was launched, and to rebut the defense's claims that the Postal Service had no basis for investigating FRC, but rather harassed FRC out of business and caused most of the complaints itself by shutting off FRC's mail.  *See United States v. Love,* 767 F.2d 1052, 1063 (4th Cir.1985), *cert. denied,* 474 U.S. 1081, 106 S.Ct. 848, 849, 88 L.Ed.2d 890 (1986) (hearsay statement admissible, although not for truth of assertions therein, to explain "why a government investigation was undertaken").  We note that to the extent Collins's testimony threatened to get into the substance or bases of the complaints received, rather than the mere fact that complaints *were* received, the district court restricted his testimony in response to timely objections by defense counsel.[3]  To whatever extent Collins's testimony may have crossed the line into improper hearsay, we

---

2. The defendants rely on dicta from the former Fifth Circuit's decision in *Elizarraras v. Bank of El Paso,* 631 F.2d 366, 374 n. 24 (5th Cir.1980), which suggested the inadmissibility of oral statements from certain Mexican bank officials and a mailed notice from a Mexican bank regarding a reduction in the appellant's bank account, under the Rule 803(6) hearsay exception. We find this case inapposite because it involved a different kind of record which apparently lacked the circumstantial indicia of trustworthiness present in the instant case.  We note in any event that the court in *Elizarraras* explicitly declined to rule on the admissibility of the disputed evidence because it was not in the record on appeal.  *See id.* at 374.

3. The following passage from the trial transcript is representative:

GOVERNMENT COUNSEL: Did there come a time in your professional capacity that you had to focus your attention on a Miami enterprise known as Federal Redemption Center?
COLLINS: Yes, I did.
GOVERNMENT COUNSEL: How did that come about?
COLLINS: That came about because of complaints received by my office in approximately August of 1986.  People were stating that they had—
COUNSEL FOR DAMIAN: Objection to the hearsay.
THE COURT: Sustained.
GOVERNMENT COUNSEL: As a result of complaint[s] received—as of August 1986 when this first came to your attention, how many complaints had the Postal Service received in its system for monitoring complaints from members of the public?
COLLINS: Approximately 1,500, 2,000.
GOVERNMENT COUNSEL: As a result of that, what did you do?
COLLINS: I started an investigation.

conclude that it failed to affect the defendants' substantial rights.

For the foregoing reasons, we conclude that the district court committed no reversible error with regard to the defendants' hearsay claims.

### B. *Rebuttal Evidence*

The defendants challenge the district court's admission as rebuttal evidence of testimony from Marilyn Young, the bad check written to Young by FRC (Exhibit 37), and testimony from Ana Gallant, a former attorney with the Postal Service's Consumer Protection Division, concerning the consent agreement entered into between FRC and the Postal Service. The district court has broad discretion in admitting rebuttal evidence. *See Gold*, 743 F.2d at 818. We find no such abuse here.

▪ Gallant's testimony plainly constituted proper rebuttal of the defense's claims that the defendants did not understand the consent agreement and that the agreement somehow constituted an official endorsement of FRC's business. *See United States v. Hall*, 653 F.2d 1002, 1006 (5th Cir. Unit A, 1981) ("[W]hen the defendant has opened the door to a line of testimony by presenting evidence thereon, he cannot object to the prosecution's accepting the challenge and attempting to rebut the proposition asserted.").

▪ Young's testimony and Exhibit 37, although arguably somewhat cumulative, tended to rebut the defense's claims of lack of fraudulent intent and, in particular, that few problems existed between FRC and its customers before the Postal Service halted FRC's mail.[4] The Government noted at trial that Young had been scheduled to appear during the case-in-chief but was unavoidably delayed by child-care responsibilities. The district court, while cautioning the Government not to "bring any more in like that," chose not to grant the defendants' mistrial motion. We cannot say that

it acted outside of its broad discretion in that regard. *See United States v. Melton*, 739 F.2d 576, 579 (11th Cir.1984).

### C. *Sufficiency of the Evidence*

In reviewing the sufficiency of the evidence, this Court is limited to asking whether, construing the evidence and drawing all inferences and credibility choices in the Government's favor, any reasonable jury could have found the defendants guilty beyond a reasonable doubt. The evidence need not exclude every reasonable hypothesis of innocence, so long as a reasonable jury could reach a verdict of guilty. *See United States v. Kelly*, 888 F.2d 732, 739–40 (11th Cir.1989); *see also Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

To prove mail fraud under 18 U.S.C.A. § 1341, the Government must show beyond a reasonable doubt: "(1) intentional participation in a scheme to defraud a person of money or property, and (2) use of the mails in furtherance of the scheme." *United States v. Simon*, 839 F.2d 1461, 1465 (11th Cir.), *cert. denied*, 487 U.S. 1223, 108 S.Ct. 2883, 101 L.Ed.2d 917, 488 U.S. 861, 109 S.Ct. 158, 102 L.Ed.2d 129 (1988).[5] To prove aiding and abetting under 18 U.S.C.A. § 2, the Government must show beyond a reasonable doubt "that the defendant (1) associated himself with the crime, (2) intended to bring it about, and (3) sought by his actions to make it succeed." *Kelly*, 888 F.2d at 742.

▪ The defendants argue strenuously that they lacked the requisite "conscious, knowing intent to defraud," *Simon*, 839 F.2d at 1466, and that the Postal Service's hold on FRC's mail from October to December 1986 was the primary cause of FRC's failure to make proper payment to some participants. The Government need not produce direct proof of scienter in a fraud case, however; circumstantial evidence of criminal intent can suffice. *See United States v. Nivica*, 887 F.2d 1110,

---

4. Young sought but did not receive a refund of her registration fee in late August, almost three months before the hold was placed on FRC's mail.

5. The defendants do not dispute, as to either the substantive counts or the conspiracy count, the overwhelming evidence of use of the mails.

1113 (1st Cir.1989), *cert. denied,* ——— U.S. ———, 110 S.Ct. 1300, 108 L.Ed.2d 477 (1990). There is evidence in this case that FRC remained reasonably current in processing incoming payments *from* participants, but fell hopelessly behind in making payments *to* many participants. Most importantly, there is ample evidence that both Damian and Peter were involved in advertising false and misleading claims in order to lure prospective participants into the coupon-clipping program. Evidence of such "unfounded representations" has been held highly probative of criminal intent. *See Simon,* 839 F.2d at 1466. Although Peter did not join FRC until after it had been up and running for some time, his instrumental assistance in developing computer and telephone services for the expanding business, together with evidence of his involvement with FRC's continuing advertising and solicitation efforts, supports the conclusion that he intentionally aided and abetted Damian's scheme.

To prove conspiracy to commit mail fraud under 18 U.S.C.A. §§ 371 and 1341, the Government must show beyond a reasonable doubt: "(1) an agreement to execute a scheme to defraud, and (2) use of ... the mails ... in furtherance of the scheme." *Id.* at 1469. The defendants again rely largely on the lack of direct evidence of any intentional agreement to defraud between Damian and Peter. A conspiracy may be inferred, however, from surrounding circumstantial evidence. *See id.* While reasonable juries might have reached different conclusions based on the evidence in this case, the pattern of false and misleading advertising claims, evidence of Damian's and Peter's joint involvement with FRC's solicitation efforts following Peter's arrival at FRC, and other evidence described above, is sufficient to support the verdicts the jury below reached.

### III. CONCLUSION

For the reasons stated, we AFFIRM both defendants' convictions on all counts.