[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 1, 2010
JOHN LEY
CLERK

_____

No. 09-14985

_____

D. C. Docket No. 08-00182-CR-CC-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

HASMUKH C. PATEL,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(October 1, 2010)

Before HULL, MARTIN and FAY, Circuit Judges.

HULL, Circuit Judge:

Defendant Hasmukh Patel appeals his convictions on various immigration

fraud-related charges and his 40-month imprisonment sentence. After review and

oral argument, we affirm.

## I. BACKGROUND

The jury convicted Defendant Patel on 12 counts relating to his helping an Indian couple, Jayesh and Darshana Patel ("Jayesh" and "Darshana," respectively) obtain fraudulent visas to come to the United States. Although Patel represented that Darshana would work at his home, Patel in fact did not provide her employment.[1] Twenty witnesses testified for the government, including Jayesh and Darshana. We recount the trial evidence.

### A.  Visa Fraud

Defendant Patel was employed as an adjudications officer for the United States Citizenship and Immigration Services ("CIS") in Atlanta, Georgia. Patel processed applications for permanent residency and U.S. citizenship.

Kamlesh Patel ("Kamlesh") was a friend of Defendant Patel's wife. In mid-2005 Kamlesh told Defendant Patel he wanted to bring his brother, Jayesh, from India to the United States.[2] Defendant Patel responded that he knew someone who could do the paperwork for a visa application for $100,000. Kamlesh agreed and paid Defendant Patel the $100,000 in cash in three installments.

---

[1]Although they share the last name "Patel," the defendant is not related to Jayesh or Darshana Patel.

[2]Kamlesh was a lawful resident of the United States.

For the first step in the H-2B work visa application process, Defendant Patel and his wife applied to the U.S. Department of Labor ("DOL") for a labor certificate on behalf of Darshana.[3] Patel's application (1) listed Darshana as the employee; (2) stated that Patel and his wife needed an unskilled worker to live and work in their home in McDonough, Georgia to assist his medically handicapped wife in caring for their children and running the household; and (3) stated Patel and his wife had tried to find a qualified U.S. worker by advertising in a local newspaper, the <u>Atlanta Journal-Constitution</u>, but were unable to recruit a suitable candidate.[4] DOL issued the labor certificate.

For the next step in the H-2B visa process, Defendant Patel and his wife, as the employers, filed a petition for a notice of approval with CIS. They also paid a

---

[3]The H-2B visa allows foreign workers to enter the United States for temporary employment. 8 U.S.C. § 1101(a)(15)(H)(ii)(b); 8 C.F.R. § 214.2(h). The H-2B application process has three steps. First, the employer applies to DOL for a labor certificate. 8 C.F.R. §§ 214.2(h)(1)(ii)(D) and 214.2(h)(6)(iii)(A). In this application, the employer must advise whether or not United States workers capable of performing the temporary services or labor are available so that DOL can make the required determination that employment of the foreign worker will not adversely affect the employment of any similarly situated U.S. worker in the area. <u>Id.</u> § 214.2(h)(6)(iii)(A). Second, the employer applies to CIS for a notice of approval. <u>Id.</u> § 214.2(h)(6)(iii)(E). Finally, the alien-employee applies to the Department of State for the work visa. For non-resident alien-employee applicants, such as Jayesh and Darshana, this final step is done at the U.S. consulate in the alien's current country of residence.

The spouse of an H-2B visa-holder may obtain an H-4 visa to accompany the other spouse to the United States.

[4]The person who responded to Defendant Patel's newspaper ad, Teresa Fruit Longo, testified that she was available for the position because she was about to end a similar position as a live-in nanny. During her interview at Patel's home, Longo found Patel to be abrupt and cold, and she thought Patel did not want her to fill the position.

$1,000 fee for accelerated processing. The petition stated that Darshana would live and work in Defendant Patel's household and that the employment time frame would be from December 22, 2005 to August 30, 2006. CIS approved Darshana for an H-2B visa as an unskilled, temporary worker.

For the final step in the visa process, Jayesh and Darshana applied for their visas at the U.S. consulate in Mumbai, India. Before they applied, Defendant Patel advised Jayesh by e-mail that Darshana was supposed to work at his home as a housekeeper. Defendant Patel also told Jayesh that, in their visa interviews, he and Darshana should discuss how they found the job, where they planned to live, and to state that in India Darshana was employed as a housekeeper and therapist, which was not true.[5]

At first, Jayesh and Darshana's visa applications were denied because they failed to show sufficient ties to India and their intent to return there when their visas expired. When Defendant Patel learned the applications were denied, he called the U.S. consulate in Mumbai and spoke with Angela Kerwin, a foreign service officer in charge of nonimmigrant visas. Patel identified himself to Kerwin as a Department of Homeland Securities ("DHS") employee and explained that he was the employer who filed the visa petition. Patel assured Kerwin the petition

---

[5]In India, Darshana taught various subjects to third- to fifth-grade-aged children in her home. She had a master's degree in chemistry.

was based on his legitimate need for a caregiver because of his wife's health and that he would ensure Darshana would return to India after her visa expired. Kerwin told Patel that, if Darshana and Jayesh reapplied for their visas, she would personally review their applications. Kerwin directed one of her employees to notify her when Jayesh and Darshana reapplied for their visas. Patel then sent Jayesh an e-mail, advising Jayesh and Darshana that when they reapply for their visas, they should take property records and other documents with them to show their ties to India and intent to return there.

Jayesh and Darshana reapplied for their visas, and this time they were approved. Kerwin, the same foreign service officer with whom Defendant Patel personally spoke, issued the visas.

After getting their visas, Jayesh and Darshana traveled from India to Atlanta. Kamlesh picked them up at the Atlanta airport. They drove directly to Camilla, Georgia, which is approximately 220 miles south of Atlanta. On the way, Jayesh called Defendant Patel to say he and Darshana had arrived in Atlanta and were on their way to Camilla. Patel said nothing about Darshana's coming to work in his home in McDonough.

About a week later, Jayesh and Darshana moved from Camilla to Brunswick, Georgia, where they worked at Kamlesh's convenience store and lived

5

in a motel owned by Jayesh's uncle. Shortly after arrival in Brunswick, Jayesh and Darshana went to Defendant Patel's home in McDonough "[j]ust to say hello." They stayed for a few hours, and no one discussed whether Darshana would work for Defendant Patel.

Sometime later, Jayesh met with Defendant Patel at Patel's home. During that meeting, Patel told Jayesh that, in order to keep their visas, Darshana had to show she was getting paid for her work and that they could do this by keeping records of her paychecks. Patel wrote several sequentially numbered checks made payable to Darshana, dated from April 15 to June 30, 2006, and sent them to Jayesh. Although Patel wrote the checks in August, he backdated them from April to June. The check numbered as coming immediately before the April 15 check was dated after it – on May 22, 2006. Defendant Patel also gave Jayesh false paycheck stubs to show that Darshana was working for Patel. Darshana never did any work for Defendant Patel.[6]

At a later meeting, Defendant Patel gave Jayesh another series of backdated checks that purported to be paychecks to Darshana. Those checks were dated from July 15 to August 31, 2006. The checks were sequentially numbered. The three

_____

[6]Although a friend of Defendant Patel's wife testified that she saw Darshana working at Defendant Patel's home "four or five times," Kamlesh, Jayesh, and Darshana herself testified that Darshana never worked there.

checks numbered as coming immediately <u>before</u> the July 15 check were all dated <u>after</u> it – in September 2006. Because neither Jayesh nor Darshana ever worked for Defendant Patel or his wife, Jayesh returned the amount of the purported paychecks to Patel in cash.

Sometime before Jayesh and Darshana came to the United States, Defendant Patel had asked Kamlesh to pay him an additional $4,000 as a fee for the visa application paperwork. Kamlesh gave Patel a $4,000 check, on which he left the date and payee lines blank. The $4,000 check eventually was dated March 6, 2006 and made payable to "Paranjay," Defendant Patel's friend and former business partner Paranjay Joshi. The check was deposited into Joshi's checking account without his knowledge.

In March 2007, Jayesh agreed to cooperate with federal investigators and participate in a recorded meeting with Defendant Patel.[7] During the meeting, Jayesh told Patel that he and Darshana were contacted by immigration authorities about Darshana's visa and her employment with Patel. Jayesh told Patel that he was worried about what he and Darshana should say to the immigration authorities about her employment with Patel.

Defendant Patel gave Jayesh a written copy of Darshana's job description

---

[7]Because they cooperated with the authorities, Jayesh and Darshana were allowed to stay in the United States.

7

for Darshana to read. When Jayesh told Defendant Patel, "The main fear I have, that Darshana's never worked here and if they ask her the question it could be a problem, nothing else," Patel responded, "Yeah, that's correct." Jayesh suggested he spent more than $100,000 to come to the United States, and Patel responded, "that's true." When Jayesh told Patel he was worried about getting into trouble after spending this money, Patel said to Jayesh, "If you have a problem, then I will have a big problem." Patel told Jayesh he should report back to him after the immigration interview, so that he would know what the interviewers asked in the event they chose to interview Patel himself.

## B.  Computer Access Violations

As an adjudications officer with CIS, Defendant Patel had access to the DHS Customs and Border Protection computer network system, which was called "The Enforcement Communications System" ("TECS"). TECS stores information about individuals and businesses that are under investigation for immigration fraud or that have engaged in illegal activity. The evidence at trial showed that, as an adjudication officer, Patel would have received training on the authorized uses of TECS and was certified to make inquiries in TECS.

On June 20, 2005 and September 21, 2005, Defendant Patel ran his own name and date of birth in TECS. On October 21, 2005, Patel ran Jayesh's name

8

and date of birth in TECS. Rand Gallagher, a CIS Associate Regional Director of the Office of Fraud Detection and National Security, testified that an authorized user of TECS would not be authorized to run his own name, or the name of a potential employee, in TECS.

## C. Jury's Verdicts

After a nine-and-a-half-day trial, the jury convicted Defendant Patel on these 12 counts: conspiracy to encourage and induce Jayesh and Darshana to come to, enter, and reside in the United States in violation of law, and that thereafter they concealed, harbored, and shielded them from detection, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I) (Count 1); encouraging and inducing Jayesh and Darshana to come to, enter, and reside in the United States in violation of law, in violation of 8 U.S.C. § 1324(a)(1)(A)(iv) (Counts 2 and 3); concealing, harboring, and shielding Jayesh and Darshana once they illegally entered the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) (Counts 4 and 5); making false statements on an application for alien employment certification and submitting that application to DOL, in violation of 18 U.S.C. § 1546 (Count 6); making the false statement in an immigration petition that Darshana would be employed in Defendant Patel's household and presenting that petition to CIS, in violation of 18 U.S.C. § 1546 (Count 7); as an employee of DHS, demanding and receiving money in return for

9

being influenced to commit a fraud on the United States, by accepting money from Kamlesh to obtain a work visa for Darshana and a visa for her husband, and by submitting forms to DOL and CIS that falsely stated Darshana would be employed in Defendant Patel's household, in violation of 18 U.S.C. §§ 201(b)(2)(B) and 2 (Count 11); and accessing a law enforcement computer system without authorization on June 20, September 21, and October 21, 2005, in violation of 18 U.S.C. § 1030(a)(2)(B) (Counts 12 to 15).[8]

## D.    Sentencing

The presentence investigation report ("PSI") grouped all 12 counts of conviction together, pursuant to U.S.S.G. § 3D1.2(b) (2008), "because they involve substantially the same harm to society" as part of a "common scheme or plan."  For Counts 1 to 5, the PSI calculated an offense level of 12, pursuant to U.S.S.G. § 2L1.1.  For Counts 6 to 7, the PSI calculated an offense level of 11, pursuant to U.S.S.G. § 2L2.1.

For Count 11, the PSI calculated an adjusted offense level of 24, consisting

---

[8]The jury acquitted Defendant Patel on these 7 counts: conspiracy to encourage and induce another couple, Chayaben and Darmesh Patel, to come to, enter, and reside in the United States in violation of law, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I) (Count 8); encouraging and inducing that couple to come to, enter, and reside in the United States in violation of law, in violation of 8 U.S.C. § 1324(a)(1)(A)(iv) and (v)(II) (Counts 9 and 10); and accessing a law enforcement computer system without authorization on January 31, 2006, in violation of 18 U.S.C. § 1030(a)(2)(B) (Counts 16 to 19).
        Defendant Patel's wife Nitigna was charged in each of Counts 1 to 10.  She was not tried with Patel, and the government ultimately dismissed the indictment against her.

of: (1) a base offense level of 14, pursuant to U.S.S.G. § 2C1.1; (2) an 8-level increase because the bribe amount exceeded $70,000, pursuant to U.S.S.G. § 2B1.1(b)(1)(E); and (3) a 2-level increase because Patel was a public official who facilitated obtaining a document related to the legal entry of an alien, pursuant to U.S.S.G. § 2C1.1(b)(4)(B).  For Counts 12 to 15, the PSI calculated an adjusted offense level of 8, consisting of (1) a base offense level of 6, pursuant to U.S.S.G. § 2B1.1(a)(2) and (2) a 2-level increase because the offense involved a computer system used by or for a government agency for ongoing investigations, pursuant to U.S.S.G. § 2B1.1(b)(15)(A)(i).

Because U.S.S.G. § 3D1.3(a) directs that the offense level applicable to the entire group should be the offense level for the most serious of the counts comprising the group, the PSI used Count 11 as the applicable offense and 24 as the total offense level.  Patel's criminal history category of I and offense level of 24 yielded an advisory guidelines range of 51 to 63 months' imprisonment.

Patel objected to the PSI's $100,000 bribe amount.  Patel argued that (1) the jury's verdict supported a bribe amount of only $4,000 and (2) there was no evidence of any other payments to him.  Patel also requested a downward variance from the 51- to 63-month advisory guidelines range, based on the 18 U.S.C. § 3553(a) factors.

11

At sentencing, the district court found that the bribe amount was $100,000. Based on Patel's total offense level of 24 and criminal history category of I, the government asked for 60 months' imprisonment. The district court determined Patel's advisory guidelines range was 51 to 63 months' imprisonment.

After hearing from family, friends, and Patel's counsel, the district court sentenced Defendant Patel to (1) 40 months' imprisonment on each of Counts 1 to 7 and 11 and (2) 12 months' imprisonment on each of Counts 12 to 15, to run concurrently.[9] The district court stated that this sentence:

> meets the sentencing goals of punishment and general deterrence and takes into consideration the seven factors outlined in Section 3553, including the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide[] just punishment, afford adequate deterrence, protect the public, et cetera.
>
> The sentence also takes into consideration the financial, emotional, and psychological hardships on the Defendant's family.

---

[9]The statutory maximum on Count 1 is 10 years, 8 U.S.C. § 1324(a)(1)(B)(i); the statutory maximum on Counts 2 to 4 is 5 years, 8 U.S.C. § 1324(a)(1)(B)(ii); the statutory maximum on Count 5 is 10 years, 8 U.S.C. § 1324(a)(1)(B)(i); the statutory maximum on Counts 6 to 7 is 10 years, 18 U.S.C. § 1546(a); the statutory maximum on Count 11 is 15 years, 18 U.S.C. § 201(b); the statutory maximum on Counts 12 to 15 is 1 year, 18 U.S.C. § 1030(c)(2)(A).

Counts 1 to 5 each carried a maximum fine of not more than $250,000, 18 U.S.C. § 3571(b)(3), or, as to Count 11, the greater of $250,000 or three times the monetary equivalent of the thing of value, 18 U.S.C. § 201(b) and 18 U.S.C. § 3571(b)(3). The district court imposed no fine at all. The district court also imposed 3 years' supervised release, 100 hours of community service, and a special assessment of $900.

## II. DISCUSSION

On appeal, Defendant Patel argues that:

1.    the district court erred in admitting expert testimony from lay witnesses on these topics: (a) the immigration application process, including CIS and DOL practices, (b) the authorized and unauthorized uses of the TECS computer system, and (c) the caste system in India, regarding specifically whether a member of a certain caste would perform housework;

2.    the government failed to provide adequate notice to Patel that it intended to present 404(b) evidence that Patel made false statements to CIS (a) in an affidavit sponsoring the immigration application of Rajendrakumar Patel, another alien and (b) in Patel's request for sick leave, and the district court abused its discretion in admitting this evidence;

3.    Patel's 18 U.S.C. § 201 conviction in Count 11 should be vacated because (a) the government failed to prove Kamlesh knew Patel was a public official and that Kamlesh paid Patel in return for Patel's performing a specific official act, i.e., the quid pro pro, and (b) the district court erred in refusing Patel's proposed quid pro quo jury instruction;

4.    the district court committed cumulative error; and

5.    Patel's 40-month sentence is unreasonable.

13

After carefully reviewing the record and briefs in this case and having the benefit of oral argument, we conclude that all of the above issues lack merit and only the following issues warrant further discussion.

## A.    Expert Testimony

Defendant Patel contends that the district court erred in admitting the testimony of lay witnesses who testified on technical matters without being qualified as experts and without the government providing requisite discovery pursuant to Federal Rule of Criminal Procedure 16.

We review a district court's rulings regarding the admissibility of lay testimony under Federal Rule of Evidence 701 for abuse of discretion.  See United States v. Myers, 972 F.2d 1566, 1576-77 (11th Cir. 1992).  Reversal is not warranted where "an error had no substantial influence on the outcome, and sufficient evidence uninfected by error supports the verdict."  United States v. Hawkins, 905 F.2d 1489, 1493 (11th Cir. 1990).

Rule 701 provides that lay testimony must be confined to opinions that are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the

14

scope of Rule 702."[10]  Fed. R. Evid. 701.  If expert testimony under Rule 702 is implicated, Federal Rule of Criminal Procedure 16 requires the government to provide written summaries of any expert witness testimony it seeks to introduce at trial in its case-in-chief.  Fed. R. Crim. P. 16(a)(1)(G).  This summary "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications."  Id.

Defendant Patel argues that the testimonies of DOL employee Isabel Jean-Pierre and DHS employees Robert DeJulius, Mark Cox, Rand Gallagher, Lori Hazenstab, and Dwight Faulker concerned specialized technical knowledge and were improperly admitted as lay opinions.  Since these testimonies were similar in subject matter, we analyze them conjointly.

These government witnesses worked in the field of immigration and testified about various procedures and training concerning the labor certification and H2-B visa application processes, the policies employed in adjudicating visa petitions, and the authorized uses of TECS.   Notably, the testimonies of these government employees were grounded in first-hand knowledge of departmental protocol and

---

[10]Federal Rule of Evidence 702 states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702.

experience accumulated in the realm of immigration work. See United States v. Marshall, 173 F.3d 1312, 1315 (11th Cir. 1999) (stating the opinion of a lay witness is "admissible only if it is based on first-hand knowledge or observation"); see also Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., 320 F.3d 1213, 1223 (11th Cir. 2003) (district court did not abuse its discretion in admitting lay testimony of repair company employees based on their "particularized knowledge garnered from years of experience within the field"). The testimonies of these government employees were both rationally based on their own perceptions about work procedures they had been trained to follow and were helpful to the jury in determining a fact in issue. Therefore, the district court did not abuse its discretion in admitting the testimonies of these government employees as lay witnesses.

Even assuming, arguendo, that this testimony constituted expert testimony, Defendant Patel suffered no prejudice to his substantial rights by the government's failure to provide Rule 16(a)(1)(G) notice and discovery. See United States v. Dulcio, 441 F.3d 1269, 1275 (11th Cir. 2006) (stating that "'[e]rror in the admission or exclusion of evidence is harmless if it does not affect the substantial rights of the parties'" in case alleging improper admission of lay testimony) (quoting United States v. Cameron, 907 F.2d 1051, 1059 (11th Cir. 1990)). As an

16

adjudications officer with CIS, Patel was intimately familiar with the H2-B visa application procedures, including the prerequisite labor certificate, and had access to TECS, enabling the opportunity for robust cross-examination. See Agro Air Assocs. v. Houston Cas. Co., 128 F.3d 1452, 1456 (11th Cir. 1997) (stating that "[b]ecause [defendant] had the opportunity to cross-examine the witnesses, any objection to the testimony went to the weight of the evidence, not to its admissibility" in case alleging improper admission of lay testimony). Moreover, Patel had full notice of the government's intent to show that he had unauthorizedly accessed TECS, as Counts 12 through 18 of the indictment specifically alleged this conduct. These factors mitigate any surprise that could be attributed to the government employees' testimony.

Additionally, the district court did not abuse its discretion by admitting the testimony of Angela Kerwin, a foreign service officer with the Department of State. Patel challenges only Kerwin's testimony that individuals who provide caregiver work in India typically belong to a particular caste. Kerwin, however, stated that a State Department adjudicator is trained to be familiar with the castes and work experience of H2-B visa petitioners and that someone in a white collar or professional job is unlikely to move to a caregiver job. Therefore, if someone who previously held a white collar or professional position were to pursue a more

17

menial vocation overseas, this would raise suspicions of fraud.

Importantly, Kerwin essentially testified regarding the training State Department adjudicators received and what information they would find relevant in assessing a petitioner's H2-B visa application. Kerwin's testimony reflected broad statements of fact and never asserted that the Patels were of a particular caste or that the caste that the Patels belonged to did not provide caregiver work. On the contrary, it was Jayesh Patel who, without objection from defense counsel, stated that "we are in an upper grade of the society where we are Patels and we are well off. We are not in that need where a lady of a house would go to do maid work."

The generalized and limited scope of Kerwin's statements regarding India's caste system attenuates Defendant Patel's assertion that her testimony related to "scientific, technical, or other specialized knowledge." Kerwin provided fact-based observations about what information State Department officials deem relevant in adjudicating visa applications. While she acknowledged the existence of castes in Indian culture, Kerwin provided neither detailed categorizations of who belongs in what caste nor any other information requiring cultural expertise. Moreover, given that India's caste system is a matter of common knowledge, it is doubtful that Kerwin's brief comments were beyond the ken of the average citizen.

Even assuming, arguendo, that Kerwin's testimony was improperly

18

admitted, any error was harmless. If a district court has improperly admitted testimony in a criminal prosecution, the errors are deemed harmless unless they "have a 'substantial influence' on the outcome of a case or leave 'grave doubt' as to whether they affected the outcome of a case." United States v. Frazier, 387 F.3d 1244, 1266 n.20 (11th Cir. 2004) (quoting Kotteakos v. United States, 328 U.S. 750, 764-65, 66 S. Ct. 1239, 1248 (1946)).

We harbor no such "grave doubts" here. Given the unchallenged testimony of Jayesh Patel, who directly testified that the Patels were of a caste that would never do maid work for another family, Kerwin's testimony on the issue of castes was essentially cumulative and added little, if anything, to the government's case. See United States v. Henderson, 409 F.3d 1293, 1300-01 (11th Cir. 2005) (holding that admission of physician's statements as lay opinion testimony was not prejudicial because it was not integral to prosecution's case and was duplicative of other testimony). Even if Kerwin's testimony helped corroborate the government's contention that Defendant Patel never intended Darshana Patel to work in his house, this allegation received ample substantiation from other compelling sources.[11] Thus, even if the district court improperly admitted Kerwin's testimony

---

[11]Jayesh testified that his wife Darshana began working in Kamlesh's convenience store in Brunswick, Georgia upon arrival in the United States and never worked for Patel. The government also produced exhibits demonstrating that Patel backdated paychecks to cover up this fact.

as that of a lay witness, Patel was in no way prejudiced by the error.

**B.    Bribery under § 201(b)(2)(B)**

Only Count 11 involved a bribery conviction under 18 U.S.C. §

201(b)(2)(B).  Specifically, § 201(b)(2) proscribes a public official's receiving a

bribe:

> (b) Whoever --
> . . .
> > (2) being a public official . . . directly or indirectly, corruptly
> > demands, seeks, receives, accepts . . . anything of value personally . . .
> > in return for:
> > > (A) being influenced in the performance of any official act;
> > > (B) <u>being influenced to commit or aid in committing, or to
> > > collude in, or allow, any fraud, or make opportunity for the
> > > commission of any fraud, on the United States</u>; or
> > > (C) being induced to do or omit to do any act in violation of the
> > > official duty of such official or person;
> . . .
> shall be fined . . . or imprisoned for not more than fifteen years, or both . . . .

18 U.S.C. § 201(b)(2) (emphasis added).  Section 201 defines "public official" to

include "an officer or employee or person acting for or on behalf of the United

States."  Id. § 201(a)(1).  Accordingly, Defendant Patel violated § 201(b)(2)(B) if:

(1) he was an employee of the United States and (2) he corruptly demanded or

accepted a thing of value (3) in return for being influenced to aid in committing

any fraud on the United States.  Id. § 201(b)(2)(B).

Defendant Patel argues that the government failed to prove Kamlesh knew

20

Defendant Patel was a public official. The plain language of § 201(b)(2)(B), however, requires that the government prove only the intent of the public official, not the person making the bribe.[12] We decline to read any such requirement into § 201(b)(2)(B).

We also reject Defendant Patel's argument that the government must prove the he accepted the bribe in return for a specific official act by him, what Patel calls a specific "quid pro quo." Section 201(b)(2)(B) contains no requirement that the public official defendant must perform a specific official act in return for the bribe. Rather, it requires only what the statute says: that the government show the public official received something of value in return for "being influenced to . . . aid in committing, . . . or allow [] any fraud, . . . on the United States." Id. § 201(b)(2)(B). This is underscored by the fact that other subsections of § 201 expressly refer to an "official act," but § 201(b)(2)(B) does not. See 18 U.S.C. § 201(b)(1)(A) (prohibiting paying an official "with intent . . . to influence any official act"), (b)(2)(A) (prohibiting an official from accepting payment in return for "the performance of any official act"), and (b)(1)(C) and (b)(2)(C) (prohibiting

---

[12]"When construing a criminal statute, [this Court] begin[s] with the plain language; where 'the language Congress chose to express its intent is clear and unambiguous, that is as far as we go to ascertain its intent because we must presume that Congress said what it meant and meant what it said.'" United States v. Browne, 505 F.3d 1229, 1250 (11th Cir. 2007) (quoting United States v. Steele, 147 F.3d 1316, 1318 (11th Cir. 1998) (en banc)).

giving and receiving, respectively, a thing of value to induce acts in violation of the "lawful" or "official" duty of a public official); see also United States v. Leyva, 282 F.3d 623, 625 (9th Cir. 2002) (concluding that § 201(b)(2)(B) contains no "official act" element, and stating "'[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion'") (quoting Gozlon-Peretz v. United States, 498 U.S. 395, 404, 111 S. Ct. 840, 846-47 (1991)).[13]

For the same reasons, we also reject Patel's argument that the district court erred by refusing to give his proposed quid pro quo jury instruction.[14] The district court charged the text of § 201(b)(2)(B)[15] and Patel has shown no reversible error

---

[13]Defendant Patel's reliance on United States v. Sun-Diamond Growers of California, 526 U.S. 398, 119 S. Ct. 1402 (1999), for the proposition that § 201(b)(2)(B) contains an "official act" requirement is misplaced. Sun-Diamond involved only § 201(c)(1)(A), which proscribes the giving of a thing of value to a public official and requires that the bribe-payor make that payment "for or because of any official act performed or to be performed by such public official." Unlike subsection (c)(1)(A), subsection (b)(2)(B) criminalizes only conduct by the public official, not the bribe-payor, and contains no language requiring an "official act." Sun-Diamond does not help Defendant Patel.

[14]We review the legal correctness of a jury instruction de novo . . . but defer on questions of phrasing absent an abuse of discretion." United States v. Prather, 205 F.3d 1265, 1270 (11th Cir. 2000) (citations omitted). "Generally, district courts 'have broad discretion in formulating jury instructions provided that the charge as a whole accurately reflects the law and the facts,' and we will not reverse a conviction on the basis of a jury charge unless 'the issues of law were presented inaccurately, or the charge improperly guided the jury in such a substantial way as to violate due process.'" Id. (quoting United States v. Arias, 984 F.2d 1139, 1143 (11th Cir. 1993)).

[15]The district court's charge was as follows:

22

in the district court's charge.

## C. Sentencing Issues

Defendant Patel argues that his 40-month sentences on each of Counts 1 to 7 and 11, to run concurrently, are unreasonable. We review the reasonableness of a sentence for abuse of discretion using a two-step process. United States v. Pugh, 515 F.3d 1179, 1190 (11th Cir. 2008). We look first at whether the district court committed any significant procedural error and then at whether the sentence is substantively reasonable under the totality of the circumstances. Id. The party challenging the sentence bears the burden to show it is unreasonable in light of the record and the § 3553(a) factors. United States v. Thomas, 446 F.3d 1348, 1351

---

Ladies and gentlemen of the jury, Count Eleven charges that the Defendant violated Title 18, United States Code, Section 201(b)(2)(B). That statute makes it a federal crime or offense for an employee of a department or agency of the United States to corruptly demand, seek, receive, accept and agree to receive and accept money in exchange for being influenced to commit or allow a fraud to be committed on the United States Government.

The defendant may be found guilty of that offense only if all of the following facts are proved beyond a reasonable doubt: First, that the Defendant was an employee of the United States Government, as charged; second, that the Defendant demanded, sought, received, accepted or agreed to receive or accept a sum of money; third, that the money was in return for the Defendant being influenced to commit, aid in the commission, or allow a fraud to be committed on the United States Government; and fourth, that in so doing the Defendant acted corruptly.

Ladies and gentlemen of the jury, an act is done corruptly if it is performed voluntarily, deliberately, and dishonestly for the purpose of either accomplishing an unlawful end or result or of accomplishing some otherwise lawful end or lawful result by an unlawful method or means.

Ladies and gentlemen of the jury, an employee of the United States Department of Homeland Security, Citizenship and Immigration Services, would be an employee of the United States.

23

(11th Cir. 2006).

Here, Defendant Patel has not shown his 40-month sentence is procedurally unreasonable. Patel mainly argues the district court erred in determining the bribe amount was $100,000 and in applying the 8-level enhancement under U.S.S.G. § 2C1.1(b)(2) and the table in § 2B1.1(b). We disagree because both Kamlesh and Jayesh testified as to the $100,000 bribe amount. See United States v. Gregg, 179 F.3d 1312, 1316 (11th Cir. 1999) ("We accord great deference to the district court's credibility determinations."). Further, in a recorded meeting, Defendant Patel himself responded "that's true" after Jayesh suggested he spent more than $100,000 to come to the United States. And Kamlesh paid the $100,000 to Patel in three cash installments, each of which occurred before Jayesh and Darshana arrived in the United States, which is consistent with the $100,000 being a payment to influence Patel to sponsor their visa applications.

Patel also argues the district court "failed to address the manner and mechanism" for computing the sentences in Counts 1 and 7. The record, however, shows the district court properly grouped all counts of conviction into one single offense, pursuant to U.S.S.G. § 3D1.1, and used the count that carried the highest total offense level – Count 11 (not any of Counts 1 to 7) – as the single offense to calculate the advisory guidelines range. See U.S.S.G. § 3D1.2 ("All counts

24

involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm [when they involve] . . . the same victim and the same act or transaction."). Patel has not shown any procedural error in the district court's guidelines calculations.

Defendant Patel also has not shown his sentence is substantively unreasonable. Indeed, after considering the § 3553(a) factors, the district court sentenced Patel to 40 months' imprisonment, which was below the advisory guidelines range of 51 to 63 months.[16]

## III. CONCLUSION

For all the foregoing reasons, we affirm Defendant Patel's convictions and sentence.

**AFFIRMED.**

---

[16]The government did not cross-appeal as to Patel's sentence.